**W.W.W. PHARMACEUTICAL COMPANY, INC., Plaintiff–Appellant,**

v.

**The GILLETTE COMPANY, Defendant–Appellee.**

**Nos. 598, 599, Dockets 92–7718, 92–7864.**

United States Court of Appeals, Second Circuit.

Argued Nov. 30, 1992.

Decided Jan. 22, 1993.

John M. Keene, New York City (Graham, Campaign & McCarthy, of counsel), for plaintiff-appellant.

Marie V. Driscoll, New York City (Douglas A. Coblens, Robin, Blecker, Daley & Driscoll; Raymond J. De Vellis, The Gillette Co., Boston, MA, of counsel), for defendant-appellee.

Before: OAKES, WINTER and WALKER, Circuit Judges.

OAKES, Circuit Judge:

W.W.W. Pharmaceutical Co., Inc. ("WWW") appeals from a judgment as a matter of law granted to defendant-appellee Gillette Co. ("Gillette"). WWW sued Gillette under the Lanham Act for trademark infringement, 15 U.S.C. § 1114 (1988), and false designation of origin, 15 U.S.C. § 1125(a) (1988). WWW also made pendant claims of unfair competition under New York common law and dilution under N.Y.Gen.Bus.L. § 368 (McKinney 1984). Finding that the United States District Court for the Southern District of New York, Constance Baker Motley Judge, properly determined the trademark claims, we affirm.

## I. BACKGROUND

WWW's predecessor in interest, Rumby International ("Rumby") began selling Sportstick lip balm in 1978. In 1981, WWW purchased Rumby's interest in the trademark as well as the formula for the lip balm. A Certificate of Registration, applied for by Rumby in 1981, was issued to WWW on May 11, 1982. In January, 1989, the United States Patent and Trademark Office accepted affidavits of use and incontestability filed in support of WWW's Sportstick registration. Gillette does not challenge the validity of WWW's registration.

WWW has been selling lip balm since 1982. The only product WWW sells, the lip balm is packaged in a royal blue tube and bears the registered trademark "Sportstick" in white letters. A tube of Sportstick is 2⅝ inches long and ⅝ inch in circumference. The product is sold from store aisle shelves, at check-out counters or in point of sale displays in retail outlets.

WWW's sales were erratic in the 1980s. At its highest point, WWW had a total of 75 accounts, including some with major national drug store and grocery chains, and the lip balm was sold in over 40 states. Sales peaked in 1985 with $233,267 in gross sales nationwide. In 1986–1987, however, WWW changed its supplier to reduce costs. As a result of the new supplier's inability to meet demand, WWW lost most of its accounts and suffered a dramatic decrease in sales. WWW acknowledges that this downturn had nothing to do with Gillette's product. After changing suppliers once again, WWW's prospects looked up briefly in early 1988 but then declined in 1989. We note only for purposes of the claims made under New York Law that WWW's gross sales in the state of New York for the years 1984 through 1988 totaled $490, with sales to only four customers.

Gillette has manufactured deodorant under the Right Guard name since 1959 and, in 1986, introduced two other lines of anti-perspirant/deodorants. In late 1986 or early 1987, Gillette decided to launch a new product under its Right Guard line. In previous years, Right Guard had suffered a decline in sales and a loss of market share due to a stodgy image and aerosol packaging. To recover market share, Gillette sought to improve the product's image by developing a "sport" line. To signify that the new product was a solid rather than an aerosol, the company called it "Right Guard Sport Stick." Gillette chose the name to connote an active lifestyle, hoping to appeal to younger consumers. Gillette was also influenced by the experience of an affiliate which had successfully used the name in the United Kingdom. In April 1987, Gillette's advertising agency conducted a series of focus group surveys to evaluate the original Right Guard trademark and the proposed Sport Stick line. The survey results showed enthusiasm for the new line on the part of young males and confirmed traditional Right Guard's loss of appeal.

Before launching the new line, Gillette's in-house trademark attorney had trademark searches done for the terms Sport and GS Sportsline. Over 60 trademarks came to light, including WWW's "Sportstick." Gillette, therefore, knew of WWW's registration of the trademark "Sportstick" for lip balm before it chose a name for its new line of anti-perspirant/deodorants.

In 1988, Gillette began to market its new line. The sport line includes deodorants and anti-perspirants sold in both aerosol and stick forms. The words "Right Guard" appear most prominently on the front label of the stick forms of the product. Located directly below the brand name and in smaller letters is the word "Sport" which is separated from the word "Stick" by a picture of a running figure. On the back label, the words "Sport" and "Stick" appear to the right of the Right Guard brand name. Here also, the name "Right Guard" is in larger print than the words "Sport Stick".

Gillette engaged in extensive advertising for the new line beginning in May 1988. Using prominent athletes on its television commercials, Gillette marketed the product nationally on such prime time programs as Monday Night Football. In addition, Gillette ran advertisements in newspapers and magazines. In all these advertisements, the words "Right Guard" immediately precede the words "Sport Stick" or "Sport Sticks". After an expensive advertising campaign, Gillette's product began to sell very well.

WWW protested Gillette's use of the mark by letter on May 12, 1988. Gillette did not stop its use of the mark. WWW began this suit on March 21, 1989, claiming that Gillette's unauthorized use of the term "Sport Stick" in the packaging and promotion of its Right Guard deodorant products had damaged WWW's federally registered trademark for lip balm. After discovery had concluded, Gillette moved for summary judgment, claiming that its use of the mark was a "fair use" as a matter of law. Judge Kenneth Conboy denied the motion in an order dated Dec. 5, 1989.

In 1991, the case was transferred for trial to Judge Motley who divided the trial into two stages, with the issue of liability to be decided prior to the hearing on damages. After WWW presented its case, Gillette moved to dismiss WWW's damage claim for failure to prove real and precise actual confusion, to dismiss WWW's complaint in its entirety for failure to establish liability as a matter of law and, pursuant to Rule 50(a) of the Federal Rules of Civil Procedure, for judgment as a matter of law on the ground that there was no legally sufficient basis for a reasonable jury to find for the plaintiff. Gillette also argued that no evidence supported an award of damages and that liability should therefore be decided by the court since only equitable relief was in issue. Judge Motley granted the motion regarding WWW's damage claim and reserved decision on the issue of injunctive relief. She then dismissed the jury. The district court ultimately found for Gillette on the remaining equitable claims. *W.W.W. Pharmaceutical Co., Inc. v. Gillette Co.*, 808 F.Supp. 1013 (S.D.N.Y. 1992).[1]

WWW appeals Judge Motley's adverse rulings on its Lanham Act claims of trademark infringement and false designation of origin and its state law claims of unfair competition and dilution.[2]

## II. DISCUSSION

### A. Lanham Act Claims

■ In order to prevail on its claims of false designation of origin under 15 U.S.C. § 1125(a) or trademark infringement under 15 U.S.C. § 1114,[3] WWW must show a like-

---

**1.** While the district court stated at several points that it was making findings of fact with respect to WWW's equitable claims, we understand the district court to have resolved those claims as a matter of law.

**2.** WWW also appeals Judge Motley's award of sanctions to Gillette. Gillette requested Rule 11 sanctions arising from a misrepresentation made by WWW's attorney regarding the substance of a witness' testimony. Gillette was granted reasonable costs and attorney's fees incurred in taking the deposition of that witness. In a later order, dated July 15, 1992, the court

amended the previous order to strike the award of costs and fees and to substitute an exclusion of the witness' testimony as an adequate sanction against WWW. No harm was suffered by WWW as this testimony had already been excluded on grounds of relevancy. As Gillette does not cross-appeal on the district court's decision not to order fees, there is no need to consider this claim.

**3.** 15 U.S.C. § 1125(a) provides in relevant part:
Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name,

lihood of confusion. Thus, WWW must show that "an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *McGregor–Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1130 (2d Cir.1979) (quoting *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir.1978) (per curiam), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979)).

WWW's trademark and unfair competition claims are based on the allegation that Gillette's use of "Sport Stick" caused WWW's potential customers to assume that Gillette was the source of WWW's mark and thus to believe that WWW was the infringer. This type of confusion has been dubbed "reverse confusion." *Lang v. Retirement Living Pub. Co.*, 949 F.2d 576, 583 (2d Cir.1991). Such a claim is actionable under the Lanham Act in this circuit. *Banff, Ltd. v. Federated Dept. Stores, Inc.*, 841 F.2d 486, 491 (2d Cir.1988). Reverse confusion has been thought to injure the reputation of the prior user of the mark by causing potential customers to consider it a trademark infringer. *Id.* at 490.

Federal Rule of Civil Procedure 50(a) allows either party to move for judgment as a matter of law. The rule reads as follows:

If during a trial by jury a party has been fully heard with respect to an issue and there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue, the court may grant a motion for judgment as a matter of law against that party on any claim, counterclaim, crossclaim, or third party claim that cannot

under the controlling law be maintained without a favorable finding on that issue.

Our role in reviewing a district court's decision on such a motion, formerly known as a judgment n.o.v., was set forth in *Howes v. Great Lakes Press Corp.*, 679 F.2d 1023, 1030 (2d Cir.), *cert. denied*, 459 U.S. 1038, 103 S.Ct. 452, 74 L.Ed.2d 605 (1982). We are to follow the same guidelines followed by district courts in deciding Rule 50 motions:

[T]he trial court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury. Rather, after viewing the evidence in a light most favorable to the non-moving party (giving the non-movant the benefit of all reasonable inferences), the trial court should grant a judgment n.o.v. only when (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him.

*Id.* (quoting *Mattivi v. South African Marine Corp., "Huguenot"*, 618 F.2d 163, 167–68 (2d Cir.1980)).

Motions prior to verdict or to overturn a jury decision are considered appropriate in trademark actions as well as other federal cases. *See Lang*, 949 F.2d at 580 (listing Second Circuit cases upholding summary judgment determinations in trademark disputes). Assessing the evidence presented in the most favorable light to WWW, we must determine whether any reasonable jury could find for WWW.

symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
  (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
  (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.
15 U.S.C. § 1114 provides in relevant part:
  Any person who shall, without the consent of the registrant, ... (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive ... shall be liable in a civil action by the registrant for the remedies hereinafter provided.

For help in making this determination, we turn to the multi-factor test perhaps best set forth in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). "The [*Polaroid*] factors are designed to help grapple with the 'vexing' problem of resolving the likelihood of confusion issue." *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 872 (2d Cir.1986) (citation omitted). Thus, the *Polaroid* test considers the following factors: the strength of the prior owner's mark, the similarity between the two marks, the competitive proximity of the products, the likelihood that the prior user will bridge the gap, actual confusion, the defendant's good faith, the quality of defendant's product, and the sophistication of the buyers. *Polaroid Corp.*, 287 F.2d at 495. In applying this test, the list of factors "does not exhaust the possibilities—the court may have to take still other variables into account. American Law Institute, Restatement of Torts §§ 729, 730, 731." *Id.* Moreover, "no single *Polaroid* factor is determinative." *Plus Prods. v. Plus Discount Foods, Inc.*, 722 F.2d 999, 1004 (2d Cir.1983). The proper approach is to weigh each factor in the context of the others to determine if, on balance, a likelihood of confusion exists. *Id.* We give the district court's findings on each of the factors considerable deference. *Lois Sportswear*, 799 F.2d at 873.

### 1. Strength of the Mark

The focus under this factor is on "the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous source." *McGregor–Doniger*, 599 F.2d at 1131. Turning on its " 'origin-indicating' quality in the eyes of the purchasing public," *id.*, a mark's strength is assessed using two factors: (1) the degree to which it is inherently distinctive; and (2) the degree to which it is distinctive in the marketplace. *Id.* at 1131–33.

■ To gauge the inherent distinctiveness of a mark, courts have used four categories: generic, descriptive, suggestive, and arbitrary or fanciful. *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976). A generic mark is generally a common description of goods and is ineligible for trademark protection. *Id.* at 9–10. A descriptive mark describes a product's features, qualities or ingredients in ordinary language, and may be protected only if secondary meaning is established. *McGregor–Doniger Inc.*, 599 F.2d at 1131. A suggestive mark employs terms which do not describe but merely suggest the features of the product, requiring the purchaser to use "imagination, thought and perception to reach a conclusion as to the nature of goods...." *Thompson Medical Co. v. Pfizer Inc.*, 753 F.2d 208, 213 (2d Cir.1985) (quoting *Stix Prods., Inc. v. United Merchants & Mftrs., Inc.*, 295 F.Supp. 479, 488 (S.D.N.Y.1968)). Fanciful or arbitrary marks are eligible for protection without proof of secondary meaning and "with ease of establishing infringement." *Abercrombie & Fitch Co.*, 537 F.2d at 11.

Judge Motley found WWW's sportstick to be a suggestive mark. Although each of the two words making up the mark is rather generic, together they make up a composite more distinctive than the sum of its parts. The district court found that:

> SPORTSTICK is not so inherently distinct and unusual to be fanciful, nor does it sufficiently evoke the characteristics of the product to be descriptive. The consolidation of "sport" and "stick" in a single word suggests both the product's form and usage, but requires some imagination to surmise the nature of the product. This is the essence of a suggestive mark.

*W.W.W. Pharmaceutical Co.*, 808 F.Supp. at 1022.

■ But a finding of suggestiveness does not guarantee a determination that the mark is a strong one. "Although a suggestive mark is entitled to registration without evidence of secondary meaning, suggestiveness is not necessarily dispositive of the issue of the strength of the mark." *Lang*, 949 F.2d at 581 (citations omitted). In evaluating a mark's strength,

a court is permitted to consider the mark's secondary meaning, that is, the extent to which the public has come to identify the mark with a particular product. *Id.; McGregor–Doniger*, 599 F.2d at 1132. However, lack of secondary meaning does not preclude a court from finding that an otherwise distinctive mark is strong. *Id.* at 1132. *Cf. Two Pesos, Inc. v. Taco Cabana, Inc.*, —— U.S. ——, ——, 112 S.Ct. 2753, 2761, 120 L.Ed.2d 615 (1992) (inherently distinctive trade dress may be protected from its inception).

Turning to the degree to which the public has come to identify "Sportstick" with WWW's lip balm, as the district court noted, WWW has had only very modest sales since it entered the business in 1982 and suffered from a severe drop in sales due to supplier problems in 1985–1986. This evidence indicates a low national recognition of WWW's product. *See Lang*, 949 F.2d at 581. Moreover, extensive third party use of the words sport and stick "weighs against a finding that [WWW]'s trade name is strong." *Id.* (citing *Plus Prods.*, 722 F.2d at 1005). Based on all of these factors, the district court found WWW's mark to be "only moderately strong, deserving of trademark protection, but not entitled to the fullest protection available under the law." *W.W.W. Pharmaceutical Inc.*, 808 F.Supp. at 1023. The district court's finding on this factor was not clearly erroneous and is upheld.

### 2. The Similarity of the Marks

Under this prong of the inquiry, we consider whether the similarity of the marks is likely to provoke confusion among potential customers. *McGregor–Doniger*, 599 F.2d at 1133. We must therefore look at the general impression created by the marks, keeping in mind all factors which the buying public will likely perceive and remember. *Id.* Thus, the district court properly considered the products' sizes, logos, typefaces, and package designs. Despite finding the two marks to be similar, the district court did not find them to be confusingly similar.

Although the marks are composed of the same words and sound the same when ut-

tered, several factors distinguish them. First, WWW's mark appears as one word and is the only identifier of the product. On Gillette's product, however, the words "sport" and "stick" are preceded in larger letters by the well-known brand name "Right Guard." Actors on Gillette's television commercials also say the words "Right Guard" before "sport stick." As this court has noted, when a similar mark is used in conjunction with a company name, the likelihood of confusion may be lessened. *McGregor–Doniger*, 599 F.2d at 1133–34. The words "sport" and "stick" are about one-third the size of the Right Guard logo and the same size as the word "deodorant" or "deodorant anti-perspirant." The district court found that the diminutive size of the words "sport" and "stick" was true for most of Gillette's advertising. In addition, Gillette's "sport" and "stick" are separated by a running figure. The dissimilar modes of presentation make confusion less likely. The products themselves are used for different purposes, lessening the chance that consumers will believe WWW's product originated with Gillette.

### 3. The Proximity of the Products

Under this *Polaroid* factor, we consider whether the two products compete with each other. *Lang*, 949 F.2d at 582. "To the extent goods (or trade names) serve the same purpose, fall within the same general class, or are used together, the use of similar designations is more likely to cause confusion." *Id.* Thus, the court may consider whether the products differ in content, geographic distribution, market position, and audience appeal. *C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.*, 753 F.2d 14, 18 (2d Cir.1985). The district court found that this factor weighed in favor of the defendant.

These products do not compete nor serve the same purpose, although they may both be generally defined as personal care products. The two products do share some of the same channels of trade but this factor alone does not make them proximate. "[S]ince 'modern marketing methods tend to unify widely different types of products

**574**

in the same retail outlets or distribution networks,' ... this factor is not of overriding importance." *Vitarroz v. Borden, Inc.*, 644 F.2d 960, 967 (2d Cir.1981) (quoting *Continental Connector Corp. v. Continental Specialties Corp.*, 492 F.Supp. 1088, 1096 (D.Conn.1979)). These products are not displayed in the same areas of food or drug stores, the lip balm being sold generally at the check out stand and the deodorant/anti-perspirant in a section devoted to such products. This factor, then, is of little help to WWW's argument that there is a likelihood of confusion.

### 4. Bridging the Gap

■ The question under this factor is the likelihood that WWW will enter Gillette's market. *Lang*, 949 F.2d at 582. This factor is designed to protect the senior user's "interest in being able to enter a related field at some future time...." *Scarves by Vera, Inc. v. Todo Imports Ltd.*, 544 F.2d 1167, 1172 (2d Cir.1976). As no evidence was presented on WWW's intentions to expand its product line, the district court properly found that the absence of this factor also reduced any likelihood of confusion.

### 5. Actual Confusion

■ The Lanham Act seeks to prevent consumer confusion that enables a seller to pass "off his goods as the goods of another." *Programmed Tax Systems, Inc. v. Raytheon Co.*, 439 F.Supp. 1128, 1132 (S.D.N.Y.1977) (quoting *Jean Patou, Inc. v. Jacqueline Cochran, Inc.*, 201 F.Supp. 861, 863 (S.D.N.Y.1962), *aff'd*, 312 F.2d 125 (2d Cir.1963)). In this case, where reverse confusion is alleged, the allegation is that a subsequent user's selection of a trademark "is likely to cause consumers to believe, erroneously, that the goods marketed by the prior user are produced by the subsequent user." *Lang*, 949 F.2d at 583. *See also Banff, Ltd.*, 841 F.2d at 490. We have explained that "the relevant confusion is that which affects 'the purchasing and selling of the goods or services in question.'" *Lang*, 949 F.2d at 583 (quoting *Programmed Tax Sys.*, 439 F.Supp. at 1132).

WWW's sole evidence of actual confusion was testimony offered by its president, Mr. Pliss. He alleged that on one occasion, an unidentified person, subsequently described by his attorney as a "friend," told Mr. Pliss that he had seen a sportstick commercial on television the night before although WWW was not running any commercials at that time. No evidence was proffered that this friend was a prospective purchaser or that confusion affected his determination to purchase WWW's product. Mr. Pliss testified to a second incident involving a call to a prospective customer, Mr. Miller, in Michigan. According to Mr. Pliss, Mr. Miller said "I thought you were from Gillette."

Under similar circumstances, the Eleventh Circuit upheld a district court's finding that no actual confusion had been demonstrated:

> Freedom Savings presented testimony regarding two alleged incidents of confusion between itself and Freedom Realty. The first was the testimony of Freedom Savings' president that some of his friends had asked if Freedom Realty belonged to Freedom Savings. The court discounted this testimony because none of the friends were identified as potential customers and none of them testified at trial.

*Freedom Sav. and Loan Assoc. v. Way*, 757 F.2d 1176, 1185 (11th Cir.), *cert. denied*, 474 U.S. 845, 106 S.Ct. 134, 88 L.Ed.2d 110 (1985). *See also Electronic Water Conditioners, Inc. v. Turbomag Corp.*, 221 U.S.P.Q. (BNA) 162 (1984) (questions as to the relationship between firms are not evidence of actual confusion of their trademarks). Mr. Pliss also alleged that on another occasion a New York retailer refused to make an appointment with him regarding his product. No evidence was presented, however, to provide a link between this refusal and Gillette's use of the mark "Sport Stick." WWW called none of these retailers to testify and offered no other evidence to support the claim of actual confusion. Judge Motley properly discounted Mr. Pliss' wholly spec-

ulative testimony as not indicative of actual confusion.[4]

### 6. Good Faith

■ As this court has noted, this factor of the *Polaroid* test considers "whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." *Lang,* 949 F.2d at 583 (quoting *Edison Bros. Stores, Inc. v. Cosmair, Inc.,* 651 F.Supp. 1547, 1560 (S.D.N.Y.1987)). Given Gillette's name recognition and good will, and WWW's obscurity, any confusion would have redounded to the plaintiff's, rather than the defendant's, benefit.[5]

Good faith can be found if a defendant has selected a mark which reflects the product's characteristics, has requested a trademark search or has relied on the advice of counsel. *See E.S. Originals Inc. v. Stride Rite Corp.,* 656 F.Supp. 484, 490 (S.D.N.Y.1987). Gillette selected a name which matched the image it was trying to project as well as the shape of the product. In addition, Gillette had a trademark search performed and relied on the advice of counsel in adopting the Sport Stick name. Gillette's knowledge of WWW's trademark does not necessarily give rise to an inference of bad faith, "because adoption of a trademark with actual knowledge of another's prior registration of a very similar mark may be consistent with good faith." *Lang,* 949 F.2d at 584. *See also United States Jaycees v. Commodities Magazine, Inc.,* 661 F.Supp. 1360, 1364–65 (N.D.Iowa

1987). WWW has not put forth any evidence that Gillette intended to promote confusion between the products or appropriate WWW's good will and therefore has not shown any bad faith on Gillette's part.

### 7. Quality of Defendant's Product

If an infringing product is of inferior quality, the senior user is entitled to protect "the good reputation associated with his mark from the possibility of being tarnished by inferior merchandise of the junior user...." *Scarves by Vera, Inc.,* 544 F.2d at 1172. WWW did not allege that Gillette's products are of inferior quality and therefore the absence of this factor also supports the district court's determination.

### 8. Sophistication of the Buyers

■ Likelihood of confusion must be assessed by examining the level of sophistication of the relevant purchasers. *McGregor–Doniger Inc.,* 599 F.2d at 1137. Thus, we must consider "[t]he general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods...." *Id.* (quoting 3 R. Callman, *The Law of Unfair Competition, Trademarks and Monopolies* § 81.2, at 577 (3d ed. 1969)).

■ Generally, purchasers of small items like lip balm are considered casual purchasers prone to impulse buying. *See RJR Foods, Inc. v. White Rock Corp.,* 603

4. WWW argues that the district court improperly excluded Mr. Pliss' personal observations of confusion exhibited by sales personnel. According to Mr. Pliss, when he asked for WWW's product, he was invariably shown Gillette's product instead. WWW's attorney initially characterized this testimony as a survey, leading Judge Motley to exclude it as not meeting the requirements for admissible survey evidence. *See American Footwear Corp. v. General Footwear Co. Ltd.,* 609 F.2d 655, 660 n. 4 (2d Cir. 1979), *cert. denied,* 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980). WWW now contends that the testimony was in fact not survey evidence but merely Mr. Pliss' personal experience. This argument would have had more force if WWW had made an offer of proof as required to preserve evidentiary rulings of exclusion for

appeal. *See* 1 Wigmore, *Evidence* § 20a at 864 (Tillers rev.1983) ("An offer of proof ... is required because an appellate court needs an adequate basis for determining whether a trial court's error regarding an evidentiary matter is prejudicial or merely harmless.... The offer of proof places the excluded evidence on the record so that the appellate court can determine whether the improper exclusion of evidence at trial warrants reversal.") (footnote omitted).

5. WWW argues that the district court erred by refusing to review *in camera* certain memoranda Gillette claimed were protected by the attorney-client privilege. We believe that the refusal was harmless under the circumstances of this case.

F.2d 1058, 1061 (2d Cir.1979). WWW's argument, however, rests on allegations of retailer confusion. Retailers are assumed to be more sophisticated buyers and thus less prone to confusion. *See Sally Gee, Inc. v. Myra Hogan, Inc.,* 699 F.2d 621, 626 (2d Cir.1983). Thus, this factor also cuts against WWW.

■■■■ In light of all the factors discussed above, we conclude that WWW's Lanham Act claims must fail.[6] As noted by the district court,

> plaintiff's view of the reverse confusion doctrine is overly expansive. Plaintiff claims that the reverse confusion theory of liability prevents a larger, more successful defendant company from extensively promoting a similar mark in such a way that plaintiff's trademark is "swallowed-up, digested and destroyed for plaintiff's use." ... However, where the parties are using similar marks on different products and where the balance of considerations ensures against a likelihood of confusion, the law does not give the plaintiff exclusive rights to usage of a particular trademark. As Judge Weinfeld has written, granting a plaintiff an injunction under such circumstances "would be tantamount to awarding it exclusive dominion over the use of the word, and the right to impair other parties' entrance into areas of endeavor far removed from its own. The trademark laws were not designed to serve this purpose."

*W.W.W. Pharmaceutical Co., Inc.,* 808 F.Supp. at 1025–26 (quoting *Information Clearing House, Inc. v. Find Magazine,* 492 F.Supp. 147, 163 (S.D.N.Y.1980)).

Even were the *Polaroid* factors more in WWW's favor, equitable factors would weigh against granting it injunctive relief.

Under the circumstances of this case, the injunction would greatly harm Gillette without giving WWW much benefit. In such cases, equitable relief is not warranted. *Lobo Enters, Inc. v. Tunnel, Inc.,* 693 F.Supp. 71, 79 n. 4 (S.D.N.Y.1988).

**B. State Law Claims**

**1. Unfair Competition**

■■■ The state law cause of action for unfair competition shares many common elements with the Lanham Act claims of false designation of origin and trademark infringement, *Perfect Fit Indus., Inc. v. Acme Quilting Co., Inc.,* 484 F.Supp. 643, 646 (S.D.N.Y.1979), *aff'd in part, rev'd in part,* 618 F.2d 950 (2d Cir.1980), including proof of actual confusion to recover damages, *see Perfect Fit Industries, Inc.,* 618 F.2d at 955, and proof of a likelihood of confusion for equitable relief. *See id.* at 953 (citing cases). As demonstrated above, WWW has shown neither actual confusion nor a likelihood of confusion.

**2. Dilution**

■■■■ WWW also seeks injunctive relief under New York's anti-dilution statute. N.Y.Gen.Bus.L. § 368–d (McKinney 1984).[7] A claim for dilution rests on the allegation that a defendant is attempting to "feed[ ] upon the business reputation of an established distinctive trade-mark or name." *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.,* 42 N.Y.2d 538, 545, 399 N.Y.S.2d 628, 632, 369 N.E.2d 1162, 1165 (1977).

Courts in this circuit have previously considered such claims, noting that:

> There are three elements of such a claim: (1) distinctiveness of the mark, either that the mark is "truly of distinctive quality" or has acquired secondary mean-

---

**6.** WWW's damage claim fails because in this circuit proof of real and precise actual consumer confusion is required to recover damages. *Coach Leatherware Co. v. AnnTaylor, Inc.,* 933 F.2d 162, 171 (2d Cir.1991). As no actual confusion has been demonstrated, WWW is not entitled to any monetary recovery.

**7.** The statute provides as follows:

Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

ing in the eyes of the public; (2) likelihood of dilution, either as the result of blurring of product identification or the tarnishing of an affirmative association that a mark has come to convey; and (3) predatory intent.

*Lobo Enters., Inc.*, 693 F.Supp. at 79 (quoting *Sally Gee, Inc.*, 699 F.2d at 625–26). WWW has not put forth evidence to support any of the elements of a dilution claim. Even were the court to accept that WWW's mark is well-known and has been subjected to dilution by Gillette's use of a similar mark, WWW has not shown any intent by Gillette to trade on WWW's reputation. *See Id.* at 79.

## III.  CONCLUSION

The judgment of the district court is affirmed.