The SPORTS AUTHORITY, INC., Plaintiff,

v.

**PRIME HOSPITALITY CORP., Defendant.**

**No. 93 Civ. 4869 (VLB).**

United States District Court, S.D. New York.

. Jan. 18, 1995.

---

Peter D. Eikenberry, Seyfarth, Shaw, Fairweather & Donaldson, New York City,

Jeffrey Sadowski, Harness, Dickey & Pierce, Troy, MI, for plaintiff.

Lawrence O. Kamin, Stewart Scott, Willkie Farr & Gallagher, New York City, for defendant.

*Memorandum Opinion and Order*

MARTIN, District Judge:

Plaintiff The Sports Authority, Inc. ("TSA"), is the owner of a chain of 85 huge warehouse-type sporting goods stores called "The Sports Authority". It has registered the name "The Sports Authority" and a logo that includes that name as service and design marks with the United States Patent and Trademark Office. Defendant Prime Hospitality Corp. ("Prime") owns and operates numerous hotels, including a number of Sheraton and Ramada Inns. Prime also operates sports-theme restaurants and bars known as "Sports Authority Food, Spirits and Sports", which are located in several of these hotels. In this action, TSA claims that Prime has infringed TSA's registered trademarks, engaged in unfair competition and diluted TSA's mark by its unauthorized use of the words "Sports Authority", and seeks a permanent injunction against Prime's use of these words and damages for infringement.

By this motion, TSA has moved for summary judgment as to liability. Prime has cross-moved for summary judgment dismissing TSA's complaint. Both parties have stated to the Court that the record is complete at this time, and that there are no further facts to be developed.

■ TSA claims that Prime's use of the name "Sports Authority Food, Spirits and Sports", and specifically the words "Sports Authority" for its bar/restaurants will create confusion among consumers as to the source, sponsorship, approval or association of products or services sold by Prime under that name. It is well settled that the evaluation of likelihood of confusion is to be guided by the eight factor test set out in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). *See also Paddington Corp. v. Attiki Importers & Distributors, Inc.*, 996 F.2d 577, 584 (2d Cir.1993).

The factors to be considered are: (1) the strength of plaintiff's mark; (2) the similarity between the two marks; (3) the proximity of the products in the marketplace; (4) the likelihood that the prior user will bridge the gap between the two products; (5) evidence of actual confusion; (6) defendant's bad faith; (7) the quality of the defendant's product; and (8) the sophistication of the relevant consumer group. *Id.* The eight factor test is not exclusive, and is not to be applied mechanically by totting up the number of factors weighing in each party's favor. *Id.* Rather, "the ultimate question [is] whether consumers are likely to be confused." *Id.*; *Lang v. Retirement Living Publishing Co.*, 949 F.2d 576, 580 (2d Cir.1991).

## A. *Strength of the Mark*

■ A mark's strength is defined as its tendency to identify goods as emanating from a particular source. This is assessed according to two factors: first, the degree to which the mark is inherently distinctive; and second, the degree to which it is distinctive in the marketplace. The inherent distinctiveness of a mark is gauged according to whether it is generic, descriptive, suggestive or fanciful. *W.W.W. Pharmaceutical Co., Inc. v. Gillette Co.*, 984 F.2d 567 (2d Cir.1993).

■ A generic mark is generally a common description of goods and is ineligible for trademark protection. A descriptive mark, on the other hand, tells something about the qualities, ingredients or characteristics of a product. It may describe a product's intended purpose, its function or intended use, its size or its merits. *Gruner & Jahr U.S.A. Publishing v. Meredith Corp.*, 991 F.2d 1072, 1076 (2d Cir.1993).

■ A descriptive mark is entitled to protection upon proof that it has acquired a secondary meaning, meaning that it has come to have an identity that consumers associate with a single source, even though the source itself may be unknown. *Id.* Extensive third party use of a mark weakens the mark and lessens the possibility that a purchaser would be confused and think the mark came from a particular single source. *Id.* at 1078; *Lang*

*v. Retirement Living Publishing Co., Inc.,* 949 F.2d 576, 581 (2d Cir.1991).

■ A suggestive mark suggests the product, though it may take imagination to grasp the nature of the product. A suggestive mark is protected without a showing of secondary meaning. *Gruner & Jahr,* 991 F.2d at 1076.

■ An arbitrary or fanciful mark bears little or no relationship to the product represented. Thus, the term may have a common meaning, but not one that describes the product. An arbitrary or fanciful mark is always entitled to trademark protection. *Id.* at 1075–76.

■ "The Sports Authority" is a descriptive mark. It describes the type of products sold by TSA's stores—sports equipment, and conveys the message, intended by TSA when it chose the name, that it is a leader or expert in that field. *See* Kamin Aff., Ex. 8 (Cohen Dep. at 32); Kamin Aff., Ex. 9 (Stevens Dep. at 79). Thus, TSA's mark must have acquired secondary meaning if it is to be entitled to trademark protection. Such a mark can acquire secondary meaning in two ways. First, it may be proved as a matter of fact that the mark represents a single source of origin to the consumer. Alternatively, secondary meaning may be established through trademark registration. *Gruner & Jahr,* 991 F.2d at 1076.

■ TSA has not proved that the words "Sports Authority" indicates a single source to consumers. However, a registered mark becomes "incontestable" if it has been in continuous use for five consecutive years subsequent to its registration and is still in use. 15 U.S.C. § 1065. This simply means that a defendant in an infringement action may not successfully contend that plaintiff's mark is entitled to no protection because it is descriptive when the mark has been registered for at least five years. *Gruner & Jahr,* 991 F.2d at 1076–77. Since TSA registered its mark on February 28, 1989, has used it at all times since then, and still uses it, the mark, though descriptive, is "incontestable" and is entitled to trademark protection as a strong mark. *See* 15 U.S.C. § 1115; *Gruner & Jahr,* 991 F.2d at 1076–1077. Nonethe-

less, defendant in this infringement action may assert any defense that would be available to it if the mark was not registered. *Id.*

B. *Similarity Between the Two Marks*

The words "Sports Authority" obviously are common to both TSA's mark, "The Sports Authority", and Prime's mark, "Sports Authority Food, Spirits and Sports". In assessing similarity, however, the Courts look to the "overall impression created by the logos and the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers." *Id. See also Jim Beam Brands Co. v. Beamish & Crawford Ltd.,* 937 F.2d 729, 735 (2d Cir.1991), *cert. denied,* 112 S.Ct. 1169 (1992); *McGregor–Doniger Inc. v. Drizzle Inc.,* 599 F.2d 1126, 1133–34 (2d Cir.1979) (stating that "trademark strength is an amorphous concept with little shape or substance when divorced from the mark's commercial context," and finding that differing contexts reduced similarity of marks whose typewritten and aural similarity approached identity); *Banff, Ltd. v. Federated Dept. Stores, Inc.,* 841 F.2d 486, 492–93 (2d Cir. 1988) (A finding of infringement cannot rest solely on the use of the same generic term when other terms are dissimilar; the Court must review the overall impression conveyed by the marks when treated as composites).

In this case, TSA's logo consists of the words "The Sports Authority" written in capital block letters with straight horizontal lines above and below the letters. This logo is used in TSA's advertisements and throughout its stores, including on t-shirts worn by all sales staff in the stores. Prime's logo is written in a stylized script, does not begin with "The" and usually includes the words "Food, Spirits and Sports". Because of these differences, the visual impact of the two marks is very different.

While TSA has submitted evidence that Prime sometimes drops the words "Food, Spirits and Sports" when referring to its restaurants, and sometimes writes the restaurant name in block letters, it has not countered Prime's assertion that it advertises its restaurants only in, and/or in conjunction

with its hotels. The fact that the restaurants are advertised only in the context of the Sheraton or Ramada Inn name creates a differing context that greatly reduces the similarity of the impressions created by the two marks.

### C. Proximity of the Products in the Marketplace

The goods and services provided by TSA and Prime are totally dissimilar. TSA's stores sell all sorts of sports equipment, clothing and accessories. Prime runs a restaurant that serves food and drinks, uses sports equipment and clothing in its decor, and affords its patrons the opportunity to watch sporting events on television while they are eating and drinking. Far more similar products have been held to be dissimilar by the courts of this Circuit. *See, e.g.,* *McGregor–Doniger Inc. v. Drizzle Inc.,* 599 F.2d 1126 (2d Cir.1979) (fine ladies' coats and mens' casual golf jackets); *Mother's Restaurants Inc. v. Mother's Bakery, Inc.,* 498 F.Supp. 847 (W.D.N.Y.1980) (Italian/pizza restaurants and more upscale restaurants that do not serve Italian food).

### D. Bridging the Gap

 The average consumer would perceive no natural connection between selling sports equipment and selling food and drink, even in a setting that uses a sports-oriented decor and spectator sports for the entertainment of its patrons. It is this average consumer's perception of likely expansion that is determinative as to this point. *Scarves by Vera, Inc. v. Todo Imports, Ltd.,* 544 F.2d 1167, 1174–75 (2d Cir.1976): *The Dreyfus Fund Inc. v. Royal Bank of Canada,* 525 F.Supp. 1108, 1119–20 (S.D.N.Y.1981). Moreover, TSA has not stated that it has any intention of moving into the restaurant and bar business. In fact, to the contrary, it has expressed a desire to be totally disassociated from any business that serves alcohol. *See* Plaintiff's Reply Brief to Defendant's Opposition to Plaintiff's Motion for Partial Summary Judgment of Liability and for Injunctive Relief and in Opposition to Defendant's Motion for Summary Judgment at 24.

### E. Evidence of Actual Confusion

 TSA has presented evidence that both Prime's restaurants and TSA's stores have received a number of telephone calls intended for the other's establishments. These calls seem to have been largely the result of the listing in the telephone directory of some or all of Prime's restaurants simply as "Sports Authority". While this might call into question Prime's representation that it always uses its mark as a whole, and makes it clear that it would be far better if it in fact did so, the type of confusion revealed by TSA's evidence is not of the sort against which the Lanham Act was intended to protect.

The Lanham Act seeks to prevent consumer confusion that enables a seller to pass off its goods as those of another. "The relevant confusion is one which affects the purchasing and selling of the goods and services in question..... Trademark infringement protects only against mistaken purchasing decisions and not against confusion generally." *Lang v. Retirement Living Publishing Inc.,* 949 F.2d 576, 582–83 (2d Cir.1991). Here it is extremely unlikely that the confusion shown would affect consumers' decisions regarding the purchase of either sports equipment or food and drinks. A consumer who wishes to buy a baseball bat and mistakenly telephones or goes to one of Prime's restaurants instead of a The Sports Authority store is not going to purchase a hamburger and a beer as a substitute.

TSA claims that its good will and its control over its reputation also are at stake. While these concerns are relevant here, TSA has not disputed that the quality of Prime's restaurant services is good, and has not presented any evidence beyond speculation either that any of its customers who mistakenly called one of Prime's bar/restaurants thought that TSA had any affiliation with those restaurants once they were informed that they had called a restaurant rather than the store, or that any such customer was offended by the possibility that The Sports Authority stores have some affiliation with establishments that serve alcoholic beverages. Therefore, TSA has not demonstrated

confusion of the sort that would support a Lanham Act claim.

### F. Defendant's Bad Faith

The question with respect to the bad faith of defendant is whether the defendant adopted its mark with the intent of capitalizing on plaintiff's reputation and good will and on any possible confusion between its product and that of the senior user. *Lang,* 949 F.2d at 583; *WWW Pharmaceutical Co., Inc. v. Gillette Co.,* 984 F.2d 567, 575 (2d Cir.1993). In general, selection of a mark that reflects the product's characteristics, a request for a trademark search and reliance on the advice of counsel are facts that support a finding of good faith. *Lang, id.; WWW, id.* Prior knowledge of the senior mark does not necessarily mandate an inference of bad faith. *Id.*

Prime began the use of marks very similar to the one at issue here ("New York Sports Authority Food, Spirits & Sports" and "Baltimore Sports Authority Food, Spirits & Sports") in 1989, with no knowledge of TSA's mark. It began to use the mark at issue here in April 1991, again without knowledge of TSA's mark. The mark does reflect the special attributes of Prime's restaurants— their sports-related decor and the opportunity to watch broadcasts of sports events while eating and drinking. Once Prime was advised of TSA's trademark registration in September 1991, it decided to continue to use its mark only after consulting counsel and receiving counsel's advice that Prime's use of the name did not constitute trademark infringement.

While the evidence on this issue is not overwhelming, TSA has not shown that Prime adopted its mark in bad faith—to trade off TSA's good will and reputation and with the intent of capitalizing on any confusion generated by the similarity between the two marks. Indeed, the disparity of the products involved suggests that defendant would derive little, if any, benefit from using a name similar to plaintiff's. Few consumers would be likely to believe that a good sporting goods store would be likely to make a good hamburger.

### G. Quality of Defendant's Product

Although TSA does not claim that the quality of Prime's restaurant services are poor, it does argue that any bar, by definition, is of poor quality, in that it has a bad image. TSA has not, however, provided the Court with any evidence to support the position that consumers generally, or sports enthusiasts in particular, view establishments that serve alcoholic beverages in such a negative way.

### H. Sophistication of Consumers

Because the products at issue here are so different, the sophistication of consumers is not of great significance. While it is true that the same sports-inclined customers might be customers of both TSA's stores and Prime's restaurants, it is unlikely that they would be misled into thinking that TSA had begun to run restaurants or that Prime was running sporting goods stores. As the Second Circuit stated in *McGregor–Doniger Inc. v. Drizzle Inc.,* 599 F.2d 1126, 1138 (2d Cir. 1979), "[t]he purchasing public must be credited with at least a modicum of intelligence."

When all of the factors set out above are weighed, the balance does not support TSA's claim of trademark infringement. Six of the eight *Polaroid* factors clearly favor Prime. While Prime's good faith may not have been proven definitively, this Court certainly cannot make a finding of bad faith on Prime's part. Moreover, as noted, the facts do not give rise to an inference that Prime derives any significant benefit from the fact that its restaurants' name is similar to TSA's mark. Thus, while TSA is entitled to a finding that, as a legal matter, it has a strong mark, that finding alone cannot support a finding of infringement where the other factors considered do not support a conclusion that there is a likelihood of confusion as to source in the minds of consumers. Therefore, TSA's Lanham Act claims must be dismissed.

TSA has also asserted claims under the New York State anti-dilution statute, G.B.L. § 368–d. Given the above findings, these claims must also be dismissed. In order to prevail on a claim of dilution, the

plaintiff must show that: (1) the mark is truly distinctive or has acquired secondary meaning; (2) there is a likelihood of dilution—either blurring of product identification or tarnishing of an affirmative association that a mark conveys; and (3) predatory intent. *WWW*, 984 F.2d at 576–77. The statute requires that there be a substantial similarity between the marks, and that there be some kind of mental association in the reasonable buyer's mind between the two parties' uses of their marks. *Mead Data Central, Inc. v. Toyota Motor Sales, USA, Inc.*, 875 F.2d 1026, 1029, 1031 (2d Cir.1989). The findings of the Court, stated above, are inconsistent with such a showing.

### CONCLUSION

TSA's motion for summary judgment in its favor as to liability is denied; Prime's cross-motion for summary judgment dismissing the Complaint is granted; and TSA's Complaint in this action is dismissed.

SO ORDERED.