**HAVEN CAPITAL MANAGEMENT, INC., Plaintiff,**

v.

**HAVENS ADVISORS, L.L.C. Havens Partners, L.P., Havens Associates, and Nancy Havens–Hasty, Defendants.**

No. 96–2862.

United States District Court, S.D. New York.

May 29, 1997.

Sandra Edelman, Dorsey & Whitney, New York City, for Plaintiff.

David K. Momborquette, Schulte Roth & Zabel, New York City, for Defendants.

### OPINION AND ORDER

JOHN FEIKENS, District Judge, Sitting by Designation.

### I. Introduction

Plaintiff, Haven Capital Management, Inc. ("Haven"), provides Investment advice to its clientele, manages funds for them on a separate account basis, and operates the Haven Fund, a mutual fund in which clients purchase shares. The Investments are in marketable equity and fixed income securities, primarily in Investment grade domestic companies. It promotes itself as a conservative Investment management firm that emphasizes long-term growth at a reasonable price.

Defendants, Havens Advisors, Havens Partners and Havens Associates, provide advice and management services to its clientele in "event based" investing, *i.e.*, primarily in risk arbitrage, in hedges and in distressed securities. Risk arbitrage is an investment strategy designed to profit from proposed mergers, takeovers, tender offers, recapitalizations and spin-offs. Hedges, simply stated, are mechanisms for the taking of compensatory measures so as to counterbalance possible loss. Distressed securities typically consist of the debt of companies that are financially Impaired and securities that are unlikely to be honored on their original terms.

Defendant Nancy Havens–Hasty is president of Havens Advisors and managing member of Havens Associates. Hasty's maiden name is Havens; her married name is Hasty. She was married in 1984. In May of 1995 she decided to use her maiden name, Havens, in connection with the businesses now known as Havens Advisors, Havens Partners and Havens Associates.

Plaintiff is the owner of Registration No. 1,939,827 on the Principal Register of the United States Patent and Trademark Office for the service mark "HAVEN," registered for use in connection with "financial Investment consulting services and financial Investment services in the field of financial assets." This registration was issued on December 5, 1995, reciting a date of first use in commerce of 1983.

Plaintiff is also the owner of Registration No. 1,943,964 on the Principal Register of the United States Patent and Trademark Office for the service mark "THE HAVEN FUND," registered for use in connection with "mutual fund investment services." This registration was issued on December 26, 1995, reciting a date of first use in commerce of June 1994.

Defendants Havens Partners, Havens Advisors and Havens Associates were formally

organized in October 1995. Defendants' clients invest their assets in Havens Partners. Defendant Havens Associates is the general partner of Havens Partners. Defendant Havens Advisors provides certain administrative and other similar management services in Havens Partners.

The mark "Haven" and the mark "The Haven Fund" and the defendants' mark "Havens" are used also as trade names.

Plaintiff Haven, citing the Lanham Act and the New York statute (Title 15, U.S.C. Section 1111, and Sections 368-d and 349 of the New York General Business Law), seeks an injunction prohibiting defendants from the use of the name "Haven."[1] No monetary damage is sought.

## II. *Applicable Law*

The Lanham Act states, and the cases teach, that a trademark and a trade name provide protection against a use of that mark or name by another which causes a likelihood of confusion.

The pertinent provision in the Lanham Act is Section 1114(1)(a). It reads:

*(1) Any person who shall, without the consent of the registrant—*

*(a) use in commerce any reproduction, counterfeit, copy or colorable imitation of a registered mark In connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; . . . .*

. . . . .

*shall be liable in a civil suit for the remedies hereinafter provided.*

The New York statute protects against dilution of a trademark in similar fashion. The issue is whether there is a likelihood of confusion.

To decide this, a seminal case, *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir.1961), points the way. In that case, Judge Friendly referred to a number of variables which had to be tested. He pref-

aced this listing by stating that these variables should be considered where the products of the prior owner (plaintiff here) are different from those of the defendant (*see also Lever Bros. Co. v. American Bakeries*, 693 F.2d 251 (2d Cir.1982)). Those variables are: (1) the strength of the mark; (2) the degree of similarity between the marks; (3) the proximity of the products; (4) the likelihood that the prior owner will bridge the gap; (5) actual confusion between the two marks; (6) defendant's good faith in adopting its mark; (7) the quality of the defendant's products; and (8) the sophistication of buyers of plaintiff's and defendant's goods or services.

The court in *Lever Bros., supra* at 253, said of these variables:

*No single Polaroid factor is preeminent, nor can the presence or absence of one determine, without analysis of the others, the outcome of an infringement suit. Rather, the trial court is required to sift the evidence relevant to each of the criteria, in the particular circumstances before it. The crucial issue is whether there exists a likelihood that an appreciable number of ordinary prudent purchasers will be misled, or simply confused, as to the source of the goods in question.*

## III. *Analysis*

It is evident that the plaintiff gives advice as to conservative investments, and that defendants give advice as to investments of a high risk nature. Both also seek investors: plaintiff in the Haven Funds, a mutual fund, and defendants in Havens Partners, a limited partnership with which Havens Associates is a general partner. Plaintiff does not engage in or seek to do financial engineering in areas in which the defendants are involved, such as risk arbitrage, hedging, and distressed securities investments. It is evident also that the defendant partnerships are content to stay in their areas of financial engineering.

Thus, each of the *Polaroid* factors must be examined to determine whether plaintiff's

---

1. Plaintiff also claims common law trademark and trade name infringement, unfair competition and misappropriation of good will, reputation or business property.

factual presentations mandate a conclusion that there is a likelihood of confusion:

■ **1. The strength of the mark.** Plaintiff argues that its name "Haven", as used in its corporate name, Haven Capital Management, Inc., is a suggestive mark, and that it has become associated with its conservative style of financial engineering. Defendants argue that the word "Havens", as used in Havens Partners, Havens Advisors, *et al.* is the maiden name of the principal defendant Nancy Havens and that the name "Havens" is used because Nancy Havens is known to a limited group of investors in a special type of financial engineering called "risk investments."

Plaintiff contends that its strength is shown by the type of word that it is; that it is a suggestive mark. *Tr. at 330.* The evidence indicates that there are seventeen businesses, national or regional, which currently employ names either identical with or similar to "Haven." The activities of these businesses are widely variant. Three of the seventeen businesses provide investment advisory services.[2] It is understandable, therefore, that the word "haven", as a comfort word, enjoys this positive use. But it is difficult to conclude that the trademark "Haven", as used by the plaintiff, has any " 'origin-indicating' quality." *See Lang v. Retirement Living Publishing Co.,* 949 F.2d 576, 581 (2d Cir.1991).

The word "haven" is a comfort word. It means safety, as in "safe haven." It is also a common word. *Transcript ("Tr.") at 84.* Companies in our country which use the name "Haven", obviously do so because of its comfort connotation. The Oxford Dictionary definitions[3] of the word "haven" are: (1) an inlet or mouth of the sea affording good anchorage; (2) place of shelter or safety or retreat, a refuge, an asylum; and (3) "haven findings" as in the function of a haven master, an officer appointed by the Crown to assist in obtaining admiralty rights.

It is difficult to conclude that in the mark, Haven, there is any independent indicia of strength which weighs in favor of finding a likelihood of confusion. Plaintiff's effort to give it strength by contending that its clientele are influenced to use plaintiff's investment services and its mutual fund because of the significant comfort or stability the mark Haven gives to its company is weakened when one considers that its clientele are more likely attracted to its conservative investment advice, which emphasizes long-term growth at a reasonable price, than its name.

[2] **2. The degree of similarity between the marks.** Obviously they are similar. Is the similarity likely to cause confusion, and what effect does the similarity have upon prospective purchasers? *Sports Authority, Inc. v. Prime Hospitality Corp.,* 89 F.3d 955 (2d Cir.1996), points out that it is necessary to determine how the marks are presented in the marketplace. Defendants are not registered investment advisors, *Tr. at 311,* and thus they are not permitted generally to advertise. Registration is a requirement imposed by regulations of the Securities Exchange Commission ("SEC"). Registration by most advisors is not sought, in part because an investment advisor that is not registered with the SEC is not required to submit to audits. The fact that defendants are not permitted to advertise, as plaintiff is, ties into the effect of similarity of the marks upon prospective purchasers. In this case, as defendants' expert testified, the defendants' partnership provides investment services only to sophisticated investors. These investors are required to put up significant money and the funds are tied up for a minimum of eighteen months. To the contrary, funds invested in plaintiff's mutual fund are readily liquid.

Thus, even though the words "haven" and "havens" are different only as to one letter, there is little likelihood of confusion in the use of these names or marks.

■ **3. Proximity of the products.** Do the products of the parties compete with each other? *W.W.W. Pharmaceutical Co. v. Gillette Co.,* 984 F.2d 567, 573 (2d Cir.1993). Direct competition between the products is

**2.** Affidavit of John W. Peavy III, para. 36, p. 11.

**3.** Compact Edition of the Oxford English Dictio-

nary—Oxford University Press 1971.

not a prerequisite to relief, but here the services that the parties render to their investors are significantly different. According to its managing director, Steven Ely, plaintiff is a conservative investment advisor and it offers to its investors "growth at a reasonable price." *Tr. at 74.* Ely admitted that, after Havens began doing business, no existing investor accounts had been lost, *Tr. at 75,* and that in the Haven mutual fund, when it began, there were sixty accounts; that when he gave his deposition, the number of accounts had increased to 180; and that when he testified, the number had grown to 287, *Tr. at 79.* John W. Peavy III, testifying for defendants, said that, "[It] would be almost impossible that you could confuse someone doing risk arbitrage with someone doing traditional Investments.... [T]hese are ... vastly different asset classes." *Tr. at 316–317.*

I conclude that a consideration of this factor weighs against the likelihood of confusion.

**4. Bridging the gap.** The evidence is conclusive that neither the plaintiff nor the defendants wish to compete with each other. Plaintiff's counsel conceded that, "[T]here's no gap to bridge In terms of investment management. We do not have any intent to go into risk arbitrage ...". *Tr. at 341.* Defendants, as the evidence shows, have no intent to involve themselves in offering conservative investment advice. Nancy Havens testified that she had no plans to adopt the investment style utilized by plaintiff and no plans to form a mutual fund. *Tr. at 237.*

The consideration of this factor does not favor plaintiff's position.

■ **5. Actual confusion.** Although the lack of actual confusion is probative, that lack does not mean that there could not be a likelihood of confusion. The evidence adduced in this case as to that factor is flimsy. Maureen M. Gibson, plaintiff's manager of marketing and administration, testified that one of her tasks is to respond to general inquiries regarding Haven "whether they come in by telephone or by mail...." *Tr. at 124.* Ms. Gibson said that she secures the name and address of a caller and attempts to determine how the caller learned about plaintiff; she indicated that over the years she

has received and responded to hundreds of questionnaires from consultants who operate either on behalf of institutions or brokerage firms. *Tr. at 125–126.* When individuals call or write, she sends out a kit as to plaintiff's philosophy, its performance record and biographies of its professional staff. *Tr. at 126.* She pointed out that a consulting firm, Evaluation Associates, tracks the performance of about 600 managers (of firms involved in financial engineering) on whom they publish profiles, summaries, backgrounds and investment results; that plaintiff has a profile in the directory of Evaluation Associates, and that it contains no mention of defendant Havens or the Havens defendants. *Tr. at 129–130.*

She testified that in the spring of 1995 she learned that Nancy Havens–Hasty had established a business using "Havens" as part of its name, and that a record was kept by her of incoming phone calls regarding Ms. Havens–Hasty. *Tr. at 134–135.* One such call on April 18 (presumably in 1995) came from Oppenheimer, a brokerage firm, seeking trade information regarding Nancy Havens–Hasty. On August 8, 1995 a brokerage firm by the name of Jeffrey called, asking for Nancy Havens–Hasty. *Tr. at 136.* On August 18, 1995 a Mark Jacobs of the Oppenheimer brokerage firm made a call to plaintiff regarding the selling of junk bonds, and it was not clear to her that this call was intended for Nancy Havens–Hasty. *Tr. at 137.*

Testimony was also elicited from Ms. Gibson as to correspondence. She referred to a letter addressed to Nancy Havens–Hasty at plaintiff's business address, 655 Third Avenue. *Tr. at 138.* She testified that "a copy of an envelope ... was sent to someone by the name of Chris Crerend" to plaintiff's address, and she said, "I believe he [Crerand] works for Havens–Hasty." *Tr. at 139.* She testified also as to a phone call that she had received from a Dabney Holt of Virginia Beach, Virginia, who said he had read about plaintiff's firm in a magazine; that he mentioned he wanted to speak to Nancy Havens–Hasty, and was advised that Havens–Hasty was not the president of plaintiff's firm. *Tr. at 140.*

On cross examination, she testified that she did not know why or how the envelope sent to plaintiff for Chris Crerand came to be delivered to plaintiff. *Tr. at 144.* As to Joint Exhibit ("J.Exh.") 51, and a reference to a person by the name of Michael Culhane, she said that she did not know whether Culhane was a broker or what his background was. *Tr. at 145.* She said that the reference to Jeffrey's, a broker named in J.Exh. 53, contained a message addressed to Nancy Haven, with the "s" in brackets. *Tr. at 146.*

I note that, with but one exception, these letters and phone calls were addressed to or directed at Nancy Havens–Hasty. Nancy Havens was not the object of the inquiries.

At most, what can be gleaned from this testimony is that the writers or callers were seeking information.

From a background of responses by plaintiff to hundreds of questionnaires that go out to consultants and brokerage firms, it appears that plaintiff's clientele is well informed as to the nature of plaintiff's business, and that the instances referred to in the evidence alluded to are not significant in proving likelihood of confusion.

Steven Ely testified as to the issue of confusion. He said, "I think some of our present accounts will be confused. I don't think we'll have a problem but I can see a situation where somebody will see something like that on television and can say: Hey, mom, you know, I thought you said Haven Capital was conservative and I just saw them up in there and they're doing arbitrage and distressed securities." *Tr. at 75.* This testimony indicates that Ely's concerns are speculative.

He continued in this vein by testifying (referring to an exhibit showing Nancy Havens on television), "I think if they see something, such as was on the stand, that they might be confused. But I think they could call and we could straighten it out. And I don't think it represents a threat to losing those accounts." *Tr. at 90.*

One final matter: Defendants point out that plaintiff did not conduct a market survey. While such a survey is not an essential requirement to establish infringement, this tool is helpful in an actual test of the market to determine whether there is a likelihood of confusion between the marks and names. Plaintiff's response is that it is too difficult to reach the kind of customer that plaintiff caters to through such a survey, and that its cost is very high. *Tr. at 356.*

I conclude that the evidence shows that it was more likely so than not so that there was no confusion as to the marks or names.

**6. Defendants' good faith.** Did the defendants adopt the name "Havens" with the intention of capitalizing on plaintiff's reputation and good will? It appears from the evidence that when Nancy Havens learned that plaintiff used the trade name "Haven Capital Management, Inc.", she immediately abandoned the three words "Capital Management, Inc." There is no evidence that when Nancy Havens decided to use her maiden name in her business activity, the name that she had used before her marriage when she was connected with the Bear Stearns Co., she did so to trade on plaintiff's reputation. She does have a right to her maiden name, provided it does not cause, or contribute to a likelihood of confusion with plaintiff's mark and name. Taken as a whole, the evidence does not point to bad faith on the part of the defendants. In *Taylor Wine Co. v. Bully Hill Vineyards, Inc.,* 569 F.2d 731, 735 (2d Cir.1978), use of a family name was permitted in a limited fashion against a registered mark. While a second comer to a trade name or mark, who has a maiden name similar to a registered name or mark, does not have an absolute right to use that maiden name, in spite of the name or mark, there is neither an absolute bar to the use of the maiden name.

Here, Nancy Havens does not use her maiden name to secure benefits from the plaintiff's use of a similar name. The way in which she uses it in the defendants' business does not cause a likelihood of confusion.

**7. Quality of the defendants' products.** In a consideration of this factor, it must be determined whether plaintiff's trademark and name "Haven" are jeopardized by the defendants' use of the name "Havens" be-

cause their products or services are of an inferior quality. There is no evidence to suggest that the quality of defendants' services to their customers is inferior to that of plaintiff. Nor is there any evidence to support any contention that because defendants engage in financial engineering in high risk ventures, that this in any way tarnishes or injures the reputation of plaintiff.

Steven Ely confirmed this by testifying, "I don't consider what Nancy [Havens] does low life. There's nothing wrong with what she does." *Tr. at 77.* In similar vein, Peter Bain, plaintiff's expert witness, testified that the defendants do not provide a lower quality of service than plaintiff does. *Tr. at 169.*

■ **8. Sophistication of buyers of plaintiff's and defendants' goods and services.** To determine whether a likelihood of confusion exists in this case, the level of sophistication of the relevant purchasers of plaintiff's and defendants' services must be examined. *W.W.W. Pharmaceutical,* 984 F.2d at 575. Simply put, can it be maintained that investors who put money into the Haven Fund, or who seek advice from plaintiff as to conservative investments, can likely be confused by Nancy Havens' use of her maiden name in financial engineering involving risk arbitrage, hedging and distressed securities?

In the defendants' business, as in the plaintiff's business, substantial amounts of money are required. These are not simple financial transactions. Nancy Havens testified that the investors with whom she deals "know everyone who does risk arbitrage, they know everyone who does distress, …, they know everyone who does small growth companies." *Tr. at 221.*

She testified, "I want people … who know what I do, who understand the risks that I'm taking, who understand that sometimes deals break but who also understand that sometimes there are very rich rewards…." *Tr. at 215–216.* She also said that there was a minimum $1 million investment that a limited partner had to make in her fund and that the smallest amount she accepted was $100,000, *Tr. at 216,* and that she has spoken personally to each and every investor in her fund. *Tr. at 219.* Steven Ely testified that most of

plaintiff's clients come through existing clients or referral sources. *Tr. at 91.*

There is a vast difference in objectives between conservative investing and the financial engineering involved in risk arbitrage or hedging, let alone the financial engineering in bringing companies back from the brink of bankruptcy.

While the plaintiff undoubtedly has pride in its corporate name and mark, it is not Nancy Havens or the defendants who threaten it.

I cannot conclude that investors who are attracted to or could be attracted to conservative investing would be or might be lost to plaintiff because there is a small financial engineering firm using the name "Havens" that invites real risktakers to do busines with it.

■ This case was also brought under the New York Anti–Dilution Law. The purpose of the New York law is largely duplicative of the purpose of the Lanham Act. A showing must be made of a distinctive mark and a likelihood of dilution. *See Sports Authority, Inc.* at 966. As stated there, dilution can consist of either blurring or tarnishment. Is there, in this case, a likelihood of blurring? Quoting *Deere & Co. v. MTD Products, Inc.,* 41 F.3d 39, 43 (2d Cir.1994), that court says that blurring "may occur where the defendant uses or modifies *the plaintiff's trademark* to identify *the defendant's goods and services,* raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product." (Emphasis in original, footnote omitted). Factors similar to those in *Polaroid* are considered.

Thus, I conclude on the basis of the facts in this case, as they apply under New York law, that there is no blurring or tarnishment. Indeed, the evidence indicates that the Haven Fund enjoys solid growth notwithstanding the existence of the Havens defendants.

Plaintiff has also failed to prove common law claims for trademark and trade name infringement, unfair competition and misappropriation of good will, reputation or business property.

## IV. *Conclusion*

■ This opinion fulfills the requirements that findings of fact and conclusions of law must be filed. For the reasons given heretofore, plaintiff's suit falls and its Complaint is DISMISSED. Defendants' request for attorney fees is DENIED, there being no exceptional circumstances in this case that would warrant such an award. *See Banff, Ltd. v. Colberts, Inc.,* 996 F.2d 33, 36 (2d Cir.1993).

**IT IS SO ORDERED.**