MEJIA AND ASSOCIATES,
INCORPORATED,
Plaintiff,

v.

INTERNATIONAL BUSINESS
MACHINES CORP.,
Defendant.

No. 94 Civ 6722 (LAK).

United States District Court,
S.D. New York.

April 1, 1996.

Dennis H. Cavanaugh, New York City, for Plaintiff.

Richard W. Clary and David A. Zonana, Cravath, Swaine, & Moore, New York City, for Defendant.

## OPINION

KAPLAN, District Judge.

Plaintiff Mejia and Associates Incorporated ("Mejia") and International Business Machines Corporation ("IBM") both sell products under the name "EduQuest." Mejia, the senior user, contends that IBM's use infringes and dilutes its mark and constitutes unfair competition. It therefore seeks to enjoin IBM's continued use of the name. Mejia, however, concedes that IBM adopted the EduQuest name in ignorance of Mejia's

use and in complete good faith and, in consequence, that Mejia is not entitled to damages. IBM moves for summary judgment dismissing the complaint on the grounds that there is no likelihood of confusion and, in any case, no basis for injunctive relief.

*Facts*

IBM and a division initially called IBM Educational Systems ("IES") have sold computer hardware, software and related services to schools with children in kindergarten through twelfth grade ("K–12") since 1985. In 1992, in circumstances described more fully below, IBM renamed IES "EduQuest." It continued to market its K–12 product line under that name.

Mejia is a small home-based entity located in Brooklyn, New York. Theodore Mejia is president, Aimee Mejia is chair and chief executive officer, and six to seven other persons appear to be involved in a non-ownership capacity. (T. Mejia Decl. ¶ 1; A. Mejia Decl. ¶ 1; A. Mejia Dep. 36–37, 60) Mejia contends that it began using the word EduQuest in commerce in November 1989 through a predecessor.[1] (A. Mejia Dep. 133; *see also* Villella Dep.Ex. B at 8410000802) While the parties characterize differently the full scope of Mejia's activity in conjunction with the mark "EduQuest," it is undisputed that the majority of this activity is advising adult individuals on how to start and run home-based businesses. (A. Mejia Dep. 60–61; Pl.Mem. 21)

*IBM's Adoption of EduQuest Mark*

James Dezell, the founder and first president of IES, held a number of meetings in 1991 to consider new names. (Dezell Dep. 20–22) In the course of the meetings, the field of names suggested by IBM's corporate naming division was reduced to a short list. (*Id.* 27) During one meeting, a manager proposed combining elements of two names from the short list: the prefix "Edu" from "Edutech" and the last part of a name ending in "Quest" to produce "EduQuest." (*Id.* 20–21; Mackenzie Decl. ¶ 4; Nelson Decl. ¶ 6) The name appealed to Mr. Dezell, who be-

lieved that it captured what the business was about: "the improvement of the educational system in America." (Dezell Dep. 30) However, some of the managers were opposed to changing the name, and an agreement was reached to keep the new name "EduQuest" closely tied with the name "IBM" through a tagline "The IBM Educational Systems Company." (*Id.* 29–30, 82–83; MacKenzie Dec. ¶ 5: Altman Dep. 25)

IBM ordered a comprehensive trademark search by an IBM intellectual property lawyer, Joseph Villella, who completed the search on January 3, 1992. He found no other occurrence of the name "EduQuest" in federal, state, and common law sources, though he found several instances of marks beginning with "Edu" or ending with "Quest." (Dezell Dep. 84; Villella Decl. ¶¶ 4–5; Def.App.Ex. 16 at 33–34) On the advice of Mr. Villella that the name was available. IBM announced the formation of the "EduQuest, The IBM Educational Systems Company" on January 22, 1992, and filed applications to register "EduQuest" as a service and trade mark with the U.S. Patent and Trademark Office on January 13 and 24. (Villella Decl. ¶ 5; Nelson Decl. ¶ 5; Def. App.Exs. 10–11) IBM also began the process of reserving the name "EduQuest" in all 50 states, an effort that was successful in all states except Wisconsin. (Def.App.Ex. 14)

In view of this record, plaintiff appropriately has conceded for purposes of this motion that IBM adopted the mark in good faith. (Pl.Mem. 28; *see also* Def.App.Ex. 35)

*IBM's Discovery of Other Users of the "Edu-Quest" Name*

After announcing the adoption of the "EduQuest" name for its K–12 products, IBM became aware of two other users of the word EduQuest, a Wisconsin retailer of computer hardware and software intended for educational purposes and a California publisher of CD-ROM software. (Villella Decl. ¶ 6) Both approached IBM, which purchased any rights they had to the name "EduQuest." (*Id.*; Def.App.Exs. 18–19)

---

1. The predecessor was dissolved in 1991 and Mejia was formed shortly before 1992. (A. Mejia Dep. 30, 134)

**544**

Prompted by these events, IBM conducted another trademark search, which was completed on June 25, 1992. (Villella Decl. ¶ 7; Def.App.Ex. 16 at 34) The second search turned up Mejia's January 30, 1992 application (filed after IBM had completed its first search) for federal registration of the mark "EduQuest: A Tradition for Tomorrow" with a graphic design. (Villella Decl. ¶¶ 5, 7.; *see also* Def.App.Ex. 22) Mejia's application described the goods and services used in connection with its mark as "production of seminars, materials, and training programs for businesses and educational institutions." (Villella Decl.Ex. B at 8410000802) IBM sent an investigator to determine the nature of Mejia's business, as a result of which it concluded that Mejia was not selling products similar to those of IBM's educational systems business unit.[2] (*See Id.* ¶ 8; Def. Mem. 6)

*The Evolving Appearance and Uses of Edu-Quest By Each Party*

The parties characterize differently the use and appearance of their "EduQuest" marks to better position their arguments about the similarity of the marks and proximity of the products, two considerations that affect the disposition of this motion. However, the evidence itself is fairly straightforward.

*IBM*

IBM has used the "EduQuest" name in conjunction with "IBM" since January 22, 1992 with its products for the K–12 schools and school districts, which include instructional software, noninstructional software (i.e., for school administrative operations), and some support and training services for using these products. (Def.App.Ex. 8; Dezell Dep. 9, 12–13, 31–32, 83; White Dep. 59–60) The tagline has changed at various points from "The IBM Educational Systems Company" to "An Educational Systems Company" to an "IBM Company." (Dezell Dep. 31–32, 37; Def.App.Ex. 16 at 10) Currently, EduQuest is being used as a sub-brand, and certain products therefore are labeled "IBM EduQuest Products." (Def.Mem. 4 n. 2; Def.App.Ex. 8;[3] Def.App.Ex. 16 at 10) IBM has sold more than $1.6 billion of products under the EduQuest name. (Def.App.Exs. 16–17, Answ. to Interrog. No. 8) and has invested more than $3 million in nationally promoting the EduQuest name. (Def.Mem. 5; Def.App.Ex. 15)

Mejia contends, without a scrap of evidentiary support, that IBM has used the name "EduQuest" standing alone and that third parties refer to IBM's products as simply "EduQuest." (Pl.Mem. 20) Indeed, the evidence to which Mejia points shows exactly the opposite. (*See* Pl.Ex. 20) Mejia relies on a teachers' handbook with a title page labeled "EduQuest (TM): An IBM Company" with the "EduQuest" in larger type, and the tagline, "An IBM Company," on the next line in smaller, but still very conspicuous, type.[4] Nowhere in the record does IBM's use of the word EduQuest appear without "IBM" appearing noticeably and in close proximity. Mejia points to no evidence that third parties refer to IBM or its products as simply "EduQuest." (Pl.Mem. 20)

*Mejia*

As already noted, the majority of Mejia's activity is advising adults on how to start and run home-based businesses. (A. Mejia Dep. 60–61, 597; Pl.Mem. 21) Mejia offers seminars, provides a newsletter disseminating information on business opportunities and networking events, and participates in or arranges shows or expositions that enable

---

**2.** IBM alleges that it nonetheless offered to purchase Mejia's rights, if any, to the name "Edu-Quest," that Ms. Mejia initially agreed that there was no actual confusion in the marketplace, that amicable negotiations occurred through the fall of 1993, that no agreement was reached, and that Mejia, after six months of silence, took the first step toward litigation by sending IBM a cease and desist letter. (Def.Mem. 2–3; Def. App.Exs. 2–3)

**3.** In IBM's 1994 software education catalogue, "IBM" appears in large letters in the top left of

the cover, while EduQuest appears three quarters of the way down the page on the right in smaller print than IBM, approximately half the type size. (Def.App.Ex. 8) The price list has a separate cover titled "IBM EduQuest Software Product Price List" on which "IBM" and "Edu-Quest" appear on the same line and in the same type. (*Id.*)

**4.** The term "EduQuest" does appear alone in small print on bottom left of the pages, preceded by a dot and the page number.

Mejia and former clients to promote their services. (A. Mejia Dep. 45, 372–373; Pl.Ex. 13 at 12)

Mejia frequently uses EduQuest in conjunction with the tagline "A Tradition for Tomorrow" and a logo described as a Peruvian maze graphic design (*see, e.g.,* Def. App.Exs. 24–25), which is precisely the mark for which Mejia initially sought registration on January 30, 1992.[5] (*Id.* Ex. 22) The newsletter is called "EduQuest Connections," and its front page contains the Peruvian design logo. (Def.App.Ex. 27 at 8400000831, S400000S94; Pl.Ex. 13)

The seminars offered by Mejia under its EduQuest name cover such subjects as "Becoming a Homebased Consultant," "Managing a Homebased Business," "Image Enhancement," and "Managing Your Personal Finances." (Def.App.Ex. 25) Two of the seminars addressed computer concerns of the home-based entrepreneur: one was called "Hardware The Easy Way: How to Buy a Computer." Another was "Computer Literacy: Conquering WordPerfect." (*Id.*)

Mejia has used the phrase EduQuest 3000, typically when the audience members are part of the educational system. (Pl.Exs. 13, 15; A. Mejia Dep. 64, 128, 373) Under the name EduQuest, 3000, for example, Mejia participated in an show called "Minority Careers in Education" produced by Tylin Enterprises, during which Mejia conducted two seminars called "Entering the World of Consulting" and "Preparing for a Change in Careers." (Mejia Dep. 357–58; Pl.Ex. 9) According to an EduQuest newsletter, Mejia also networked with the educational community and showcased its program for profes-

sional development for teachers and supervisors at the show. (*See* Pl.Ex. 13 at 1)

The principals of Mejia all have been teachers in New York City schools (Pl.Mem. 24; A. Mejia Dep. 31–32, 45, 598), which perhaps explains their attendance, on occasion, of conferences on alternative education and their plans to provide proposals on curriculum reform and to obtain grants for curricular programs. These endeavors allegedly have included: (1) participation in a conference in September 1989 about changing the educational system, which inspired the hope to participate in an alternative high school in New York City, perhaps by teaching entrepreneurialship, a plan never implemented (A, Mejia Dep. 587–90, 360–63 619–21; Skeete Dep. 97–98, 99–101, 103–04), and (2) drafting and planning to submit a grant proposal to Con Edison for a program on multiculturalism geared toward teachers and administrators as well as students.[6] (A. Mejia Dep. 612–615; Pl.Ex. 5; Skeete Dep. 81–82)

Notwithstanding the Mejia principals' avowed interest in and involvement with educational reform, there are no kindergarten through twelfth grade institutions that are actual customers of Mejia. (A. Mejia Dep. 81; *accord,* Homer Decl. ¶ 6) All of Mejia's course and program offerings have been directed to *individuals* (A. Mejia Dep. 81), with the possible exception of contracts in spring of 1995 with the Support Center of New York to conduct seminars for teacher coordinators at a youth center and to perform some unspecified activity with a Head Start project in New Jersey. (A. Mejia Decl. ¶ 6)

Mejia's revenue is modest compared to IBM's, amounting to a total of $50,917 be-

5. Mejia's application for trademark registration was rejected on May 15, 1992 for failure to meet certain requirements. (Def.App.Ex. 20) Mejia did not reapply for registration until nearly two years later, before filing its complaint. (*Id.* Ex. 23) In its second application, Mejia dropped the accompanying design logo. (*Id.*)

6. Plaintiff claims to have submitted a proposal to the New York State Department of Education to provide bilingual basic education to immigrants. (Pl.Mem. 3) The Court notes that this appears to be a grant proposal by another organization, Third World Women Changer of Commerce &

Industry, of which Ms. Mejia is Chair and a member of the Board of Directors, which casts into doubt whether this may properly be considered an activity of Mejia under the name EduQuest. (*See* Pl.Ex. 3)

In addition to the alleged curricular endeavors by plaintiff, it is evident that Theodore Mejia, while he was still a full time teacher at Thomas Jefferson High School and union coordinator, used EduQuest letterhead to coordinate a rededication breakfast after three students had been shot and a teacher wounded. (Pl.Ex. 2; A. Mejia Dep. 314–16; T. Mejia Dep. 252–54)

tween 1989 and 1994, a figure that does not reflect the deferred compensation owed to the principals and associates of Mejia. (Def.App.Ex. 5; A. Mejia Dep. 366–70) Ms. Mejia estimated about 80 percent of the revenue was from the seminars pitched to the business community rather than to the education community. (A. Mejia Dep. 373)[7] Apart from whatever cost may be attributed to Mejia's advertising of its services in its newsletter and participation in shows, Mejia has spent under $5,000 in advertising on the radio and in local newspapers. (Def.App.Ex. 27; *see also* Pl.Mem. 31)

## Discussion

Defendant seeks summary judgment dismissing both the Lanham Act, 15 U.S.C. § 1125(a), and state claims for unfair competition and dilution. The Court must determine whether plaintiff has raised genuine issues of material fact after drawing all reasonable inferences in plaintiff's favor. *See Universal City Studios, Inc. v. Nintendo Co., Ltd.,* 746 F.2d 112, 115 (2d Cir.1984).

*The Lanham Act Claim*

*Liability*

■ Plaintiff's Lanham Act claim is one of reverse confusion. The essence of the claim is that consumers are likely to assume mistakenly that the subsequent user of the mark, here IBM, is the source of the goods and services of the senior user, here Mejia. *W.W.W. Pharmaceutical Co., Inc. v. Gillette Co.,* 984 F.2d 567, 571 (2d Cir.1993); *Lang v. Retirement Living Publishing Co.,* 949 F.2d 576, 583 (2d Cir.1991); *Banff, Ltd. v. Federated Dept. Stores, Inc.,* 841 F.2d 486, 490–91 (2d Cir.1988); 3 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23.01[5] (3d ed.1995) (hereinafter MCCARTHY ON TRADEMARKS). The reverse confusion theory protects the mark of a prior user from being overwhelmed by a subsequent user, typically where the subsequent user is larger and better known and consum-

ers might conclude that the senior user is the infringer. *See W.W.W. Pharmaceutical,* 984 F.2d at 571; *Banff,* 841 F.2d at 490–91; 3 MCCARTHY ON TRADEMARKS § 23.01[5], at 23–22.

■ IBM contends that plaintiff lacks sufficient evidence to raise a genuine issue of fact as to the crucial element of likelihood of confusion.[8] In both forward and reverse confusion cases, likelihood of confusion is assessed with reference to the factors enunciated in *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492 (2d Cir), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). *Compare Banff,* 841 F.2d at 491 *with Universal City Studios,* 746 F.2d at 115. The *Polaroid* factors, none of which alone is dispositive, include: (1) strength of plaintiff's mark; (2) similarity of the marks; (3) proximity of the goods or services (4) likelihood of bridging the gap; (5) quality of the products; (6) buyer's sophistication; (7) actual confusion; and (8) defendant's good faith in adopting the mark.

### (1) Strength of Plaintiff's Mark

■ The strength of plaintiff's mark depends on two factors: (1) its inherent distinctiveness (*i.e.,* whether it is generic, descriptive, suggestive or fanciful) and (2) the degree to which it is distinctive in the marketplace (*i.e.,* degree to which consumers recognize that the mark as identifying the source of the goods). *Lang,* 949 F.2d at 581; *W.W.W. Pharmaceutical,* 984 F.2d at 572.

■ On this record, plaintiff's mark is most likely suggestive. The terms "edu," which obviously connotes education, and "quest," which connotes journey, associate plaintiff's products with some type of educational venture. The prefix "edu" and word "quest" are too meaningful and concrete in the English language to be considered fanciful. The mark EduQuest is suggestive for the same reason the Second Circuit found

---

7. The bulk of Mejia's revenue derives from the seminars. Ms. Mejia estimated that in 1994 the seminars comprised 70% of the revenue, the newsletter 20%, and the expositions 10%. (A. Mejia Dep. 372)

8. To succeed in a reverse confusion claim, plaintiff must show both that its mark is protectible and that there exists a likelihood of confusion as to the source of the goods. *Banff,* 841 F.2d at 489. Defendant does not protest the eligibility of plaintiff's mark for protection.

"Sportstick" to be a suggestive mark for lip balm: it " 'suggests both the product's form and usage, but requires some imagination to surmise the nature of the product' " which is the " 'essence of a suggestive mark.' " *W.W.W. Pharmaceutical,* 984 F.2d at 572 (quoting and adopting the analysis of the district court).[9]

■ In terms of distinctiveness in the marketplace, the record, interpreted most favorably to plaintiff, shows modest recognition of its mark in the New York and perhaps tri-state area. . Plaintiff's limited revenue and advertising expenditures, in combination with the local, as opposed to national customer base, indicate that the mark, although suggestive, is not strong. *Cf. W.W.W. Pharmaceutical,* 984 F.2d at 572; *Lang,* 949 F.2d at 580.

#### (2) Similarity of the Marks

■ An obvious similarity between Mejia's mark and IBM's mark is that they both use the word "EduQuest." However, marks are not "similar" for purposes of assessing likelihood of confusion simply because they contain an identical or nearly identical word. *See W.W.W. Pharmaceutical,* 984 F.2d at 573 (plaintiff's mark "Sportstick" for lip balm was not similar to defendant's mark "Right Guard Sport Stick" for deodorant); *Lang,* 949 F.2d at 581–82 (although both marks included the words "New Choices," the general impression conveyed by the designations was different); *International Data Group, Inc. v. J & R Electronics, Inc.,* 798 F.Supp. 135, 139 (S.D.N.Y.), *aff'd,* 986 F.2d 499 (2d Cir.1992) ("Computerworld" lacked confusing similarity to "J & R Computer World"); *see generally Universal City Studios,* 746 F.2d at 117 (each trademark must be compared in its entirety; juxtaposing fragments of each mark does not demonstrate whether the marks as a whole are confusingly similar).

■ One factor that heavily undercuts the contention that the marks are confusingly similar is that defendant consistently uses the word "IBM" as an identifier in a tagline or conspicuously nearby. The addition of the defendant's brand name beside the mark "Sport Stick" was a significant reason that the Second Circuit found no confusing similarity to plaintiff's mark "Sportstick" in *W.W.W. Pharmaceutical,* another reverse confusion case in which, it should be noted, the Court affirmed judgment for the defendant as matter of law under Fed.R.Civ.P. 50(a). In *Lang,* a reverse confusion case in which summary judgment for the defendant was affirmed, the Court found a lack of confusing similarity between marks, both of which contained the words "New Choices," in large part because the defendant always included the words "For the Best Years." [10]

It is fair to say that the typefaces of the word "EduQuest" in plaintiff's and defendant's marks are not readily distinguishable, as was the case for the marks containing the word "New Choices" at issue in *Lang.* But in no other respect is defendant's mark presented in a manner that enhances the similarity of the word "EduQuest," such as placement in a particular location. The name "IBM" is well-known, carries greater identification of source than "EduQuest," and appears with comparable or greater prominence than the word "EduQuest," thereby enhancing the distinct impression conveyed to consumers.

#### (3) Proximity of the Goods or Services

■ This *Polaroid* factor is concerned primarily with whether the two products or product lines compete with one another. *W.W.W. Pharmaceutical,* 984 F.2d at 573. Relevant considerations include the extent to which the goods or services fall within the same class or are used together, as well as any differences in content, purpose, geo-

---

**9.** Plaintiff's claim that the mark is arbitrary or fanciful is untenable given the plain meanings of the word "quest" and the prefix for "education."

**10.** In *Banff,* the Court found that defendant's attachment of its brand name, Bloomingdale's, to the mark "B Wear" may have increased the misappropriation of plaintiff's goodwill in the mark "Bee Wear" because the defendant placed its name Bloomingdale's "in very small letters," thus failing to offset the similarity of the marks. 841 F.2d at 492. In contrast, here IBM uses its brand-name with comparable or greater prominence than the word "EduQuest," so the similarity is offset effectively. (*See, e.g.,* Def.App.Ex. 8; Def.App.Ex. 16 at 10; note 3 *supra* )

graphic distribution, market position and audience appeal. *Id.*

■ It is undisputed that the bulk of Mejia's activity is advising adults on how to start and run home-based businesses (A. Mejia Dep. 60–61, 697; Pl.Mem. 21) and that Mejia derives its revenue primarily through seminars and, to a lesser extent, through expositions and a newsletter. IBM, on the other hand, offers computer hardware and software and some support services to K–12 schools. (*See, e.g.,* Def.App.Ex. 8; Dezell Dep. 9, 12–13)

To escape the seemingly obvious conclusion that the bulk of plaintiff's services are not competitive with defendant's, Mejia contends that both are in the same general class of "educational services." (Pl.Mem. 23) However, this type of classification is so broad as to be meaningless for purposes of determining that the products are proximate. The Court in *W.W.W. Pharmaceutical* resisted the conclusion that lip balm and deodorant were competitive or served the same purpose even though "they may both be generally defined as personal care products." 984 F.2d at 573. Likewise, in *Lang,* the Court found that defendant's magazine that catered to older adults and plaintiff's publishing house were not rendered proximate products because they were both "in the field of publishing." 949 F.2d at 582. By increasing the level of generality, any products can be made to appear to fall in the same class. Aspirin and easy chairs could be characterized as "comfort products." Jet planes and roller blades could be characterized as transportation products. Such semantic exercises simply are not helpful in assessing likelihood of confusion.

■ Plaintiff next attempts to make the parties' services appear proximate by point-

ing to the potential overlap of clientele, as many of Mejia's clients may be former and part-time teachers, parents of K–12 children, or even IBM consultants. (Pl.Mem. 21–22) However, Mejia confuses the inquiry.[11] The question is whether the parties offer their products to the same market audience, not whether participants in one market may coincidentally be consumers in another. While IBM offers its products and services to schools, Mejia has no customers that are K–12 institutions (A. Mejia Dep. 81) Practically all of Mejia's offerings are directed to adult individuals. Even if it were a legitimate consideration, the potential overlap of audience members with respect to parents of K–12 children and IBM consultants is merely a surmise by plaintiff, not supported by any evidence. Mere conjecture cannot be used to defeat summary judgment. *See, e.g., Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995).

Although Mejia specifically caters to members of the educational system through services offered under EduQuest 3000, the evidence shows that the purpose is overwhelmingly to help educators enhance their professional skills or make career transitions. (Mejia Dep. 64–65, 357–58; Pl.Ex. 9, Pl.Ex. 13 at 1) In contrast, IBM's purpose is to provide tools for the curriculum or administrative operation of a school. The different purpose for which Mejia provides services to educators mitigates any confusion that otherwise might be caused by a mere overlap of participants in each party's market.[12] Moreover, plaintiff is strictly a local enterprise functioning, on a charitable view, in the tri-state area, whereas IBM is a multinational enterprise.

In light of all these considerations, no reasonable factfinder could conclude that the

---

11. *Cf. Giorgio Beverly Hills, Inc. v. Revlon Consumer Products Corp.,* 869 F.Supp. 176, 183 (S.D.N.Y.1994) (the claim that products compete with each other may not be supported by evidence that both products will be advertised in the same media "because the same claim could be made of almost any product which is publicly advertised").

12. Plaintiff's avowed interest in K–12 curricular reform has not, as yet, translated into any business or client relationship with schools. Whether plaintiff may succeed in obtaining funding or acceptance of its intended proposals for curricular reform is an issue more properly considered under the next *Polaroid* factor, the likelihood of bridging the gap. The same is true of plaintiff's insistence that both parties share a purpose of shaping the educational system, because plaintiff's K–12 curricular purpose is, at this point, more a question of intent than realization.

parties offer products or services proximate to one another in any material degree.

### (4) Likelihood of Bridging the Gap

■ This factor looks at the likelihood that a senior user will enter a junior user's market. *Lang,* 949 F.2d at 581.

■ Interpreting the record most favorably to plaintiff, plaintiff hopes to provide curriculum-shaping services to K–12 school systems. The strongest evidence is a draft grant proposal to Con Edison for a project on multiculturalism (A. Mejia Dep. 612–615; Pl.Ex. 5; Skeete Dep. 81–82) in combination with the background of Mejia's principals in teaching and its participation in a conference on curricular reform as early as 1989. Although there is no evidence that plaintiff will succeed in its desire to provide services directly in the area of K–12 curricular reform, it is a reasonable inference that they might succeed in obtaining school systems as clients.

Nevertheless, the Court may not lose sight of the fact that the main consideration here is whether a senior user's intent to bridge the gap will make the products more competitive in a manner that enhances the likelihood of confusion. Even assuming that plaintiff succeeds in offering curricular-shaping services to K–12 schools, the services of plaintiff and defendant will take quite quite different forms. IBM's curricular services are offered through the media of computer hardware and software. In contrast, the evidence of plaintiff's plans shows a more interpersonal and grass roots approach: namely, workshop and seminar offerings, as demonstrated by the Con Edison proposal and the EduQuest 3000 program outlines.[13] (*See* Pl.Exs. 1, 5)

Plaintiff has sought to put in issue its professed hope to develop educational CD–ROM and on-line services.[14] (Pl.Mem. 24–25) However, the only evidence on this point indicates that these possibilities are no more than bare ideas that have not been conceived with any degree of particularity. In fact, plaintiff has not investigated the technical and financial obstacles to realizing these ideas, other than reading manuals like "CD–ROM for Dummies" available at computer stores. It appears that plaintiff is in no serious position to attempt to carry out these ideas: it has not even obtained financing or prepared an application for financing. (T. Mejia Dep. 47–49, 93–96, 98–113; A. Mejia Dep. 93–94; *see generally* Def.Mem. 10–13) It also is common sense that it would take resources and research and development far beyond plaintiff's present capacity to realize the hope of expanding into the CD–ROM and on-line marketing in providing K–12 curricular services. Because of the wholly speculative nature of plaintiff's articulated hope to provide K–12 curricular reform services through CD–ROM and on-line services, its hopes are not meaningful evidence of a likelihood of confusion. *Accord, Lang,* 949 F.2d at 582; *see also Inc. Publishing Corp. v. Manhattan Magazine,* 616 F.Supp. 370, 386 (S.D.N.Y.1985), *aff'd,* 788 F.2d 3 (2d Cir. 1986).

All evidence considered and reasonable inferences drawn in plaintiff's favor lead to the conclusion that plaintiff has demonstrated intent and some likelihood of bridging a small part of the gap by providing curricular-focused services, but that the medium would be interpersonal rather than high tech. Thus, the likelihood of confusion is, at best, only marginally increased by the evidence of plaintiff's likelihood of bridging the gap.

### (5) Quality of the Products

■ Poor quality of products sold under a defendant's mark typically is relevant to a senior user's interest in protecting the reputation of its mark from the possibility of being tarnished by inferior merchandise of a junior user. *W.W.W. Pharmaceutical,* 984 F.2d at 575. Here, plaintiff does not dispute

---

13. Plaintiff has offered *workshops* on how to buy computer inexpensively and how to use word processing (A. Mejia Dep. 66–68) and claims to teach "computer literacy" (Pl.Ex. 1 at 840000233). Nevertheless, *plaintiff's services are not provided through high tech media,* even if the subject matter has and will, in some instances, touch on technology.

14. Plaintiff does have an e-mail address through which it has sought to promote its services and solicit newsletter orders. This type of on-line service is a distinct issue from the plaintiff's professed hope to offer curricular services through an on-line medium.

that defendant's products are of high quality. (*E.g.,* A. Mejia Dep. 427)

### (6) Buyer's Sophistication

 This factor calls for assessment of the general impression of an ordinary purchaser buying under ordinary conditions and giving the attention that purchasers usually give in buying the relevant class of goods. *W.W.W. Pharmaceutical,* 984 F.2d at 575. Mejia's customers are predominantly adults between the ages of 32 and 45, most with high school diplomas and approximately half of them professionals (A. Mejia Dep. 281–82) Plaintiff's home-based operation and use of local advertising tend to militate against any assumption in the minds of consumers that they might be purchasing from a large company like IBM rather than from a smaller concern. Overall, the sophistication of the buyers is no better, from the plaintiff's point of view, than a neutral factor.

### (7) Actual Confusion

Most of the evidence of actual confusion proffered by plaintiff relates to events that allegedly occurred in connection with Mejia's participation in the 1995 show called "Minority Careers in Education," which was produced by Tylin. According to Ms. Mejia, when she contacted Tylin promotions, a man who identified himself as Bob Rilli asked for her company's name, to which she responded "EduQuest." He then said, "[T]hat's IBM." (A. Mejia Decl. ¶ 2) Ms. Mejia alleges that Tylin's Mr. Greenspan, whom she described as a friend, subsequently advised her that an event coordinator, whom she understood to be Mr. Rilli, had asked whether Mr. Greenspan knew that the name EduQuest belonged to IBM. (*Id.* ¶ 3) According to Theodore Mejia, whose version of events was adopted by Ms. Mejia (A. Mejia Decl. ¶ 5), at least 27 recipients of plaintiff's handouts at the show, including two teachers from Thomas Jefferson High School who were identified by name, responded with statements such as "Oh! We get your software." (T. Mejia

Decl. ¶ 3) According to Mr. Mejia, there were so many people who confused Mejia with IBM that day that it was not possible to keep an accurate account of the people confused. (*Id.*)

Plaintiff points also to deposition testimony by Louis Vigliotti, a teacher who was a friend of Ms. Mejia's, who said he was confused at first upon seeing defendant's sign at a 1992 or 1993 show. Mr. Vigliotti testified that when he saw the sign, he "walked over and said what is IBM doing with Aimee's name. I was with a [mutual friend] and I said, oh, that's Aimee's company." (Vigliotti Dep. 46–47) Mr. Vigliotti said that, when he saw the sign, he thought it was Aimee Mejia. (*Id.* 51) As he got closer, he saw that the sign said "IBM," at which point, he remarked to his friend, "oh shit, wow." (*Id.* 52) He then told his friend, "[L]ook, IBM is using Aimee's name." (*Id.*) When asked whether he ever thought that Mejia was in any way related to IBM, Mr. Vigliotti responded, "No. No." (*Id.*)

 Mr. Vigliotti's testimony does not advance plaintiff's case. At best, it is evidence of forward confusion—that he believed momentarily that Mejia was the source of IBM's display or that IBM stole Mejia's trade name. As the Second Circuit made clear in *Lang,* however, evidence of forward confusion simply is not relevant in a reverse confusion case. 949 F.2d at 583; *accord,* 3 McCarthy on Trademarks § 23.01[6], at 23–28.

 This leaves the anecdotal evidence from the Mejias concerning the alleged confusion related to the 1995 Tylin show. It is of limited significance. First, it is the only evidence of actual reverse confusion in the entire record. Second, the portion of plaintiff's clientele associated with education, which was the audience at the exposition, is but a relatively small subset of Mejia's total client base. Thus, the evidence, even according it the greatest possible weight,[15] does not go far toward demonstrating that an "*appreciable* number of ordinarily prudent purchas-

---

**15.** It should be noted that other courts have altogether discounted bits of evidence of actual confusion where the sole source of it is the principal or employee of the complaining party. *See, e.g., W.W.W. Pharmaceutical,* 984 F.2d at 574–75; *Gruner + Jahr USA Publishing v. Meredith Corp.,* 991 F.2d 1072, 1078 (2d Cir.1993).

ers" are likely to be confused." *Universal City Studios, Inc.*, 746 F.2d at 115 (emphasis added); *see also id.* at 118 n. 8 (the existence of a few confused consumers does not create a disputed issue of fact sufficiently material to make summary judgment improper).[16]

Thus, plaintiff's evidence of actual consumer confusion makes this factor weigh in its favor, albeit only moderately so.

### (8) Defendant's Good Faith

As noted, plaintiff has conceded IBM's good faith for summary judgment purposes.

\* \* \* \* \* \*

█ "[T]he crucial issue in an action for trademark infringement or unfair competition is whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir.1978) (per curiam) (citation omitted), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). The *Polaroid* factors "are utilized and balanced to determine the likelihood of confusion ..." *Universal City Studios,* 746 F.2d at 116. And while each of the individual *Polaroid* factors requires a determination of fact, the ultimate question as to likelihood of confusion is a question of law. *E.g., Sterling Drug, Inc. v. Bayer AG,* 14 F.3d 733, 743 (2d Cir.1994). In consequence, while likelihood of confusion often will turn on the outcome of disputed questions of fact, "summary judgment is appropriate if the court is satisfied that the products or marks are so dissimilar that no question of fact is presented" or that there is no likelihood of confusion. *Universal City Studios, Inc.,* 746 F.2d at 116; *accord, Durham Industries, Inc. v. Tomy Corp.,* 630 F.2d 905, 918 (2d Cir.1980); *see also Warner Bros. Inc. v. American Broadcasting Cos.,* 720 F.2d 231, 246 (2d Cir.1983).

█ In this case, plaintiff concedes IBM's good faith and, for all practical purposes, the quality of IBM's products. Viewing the evidence on each of the other *Polaroid* factors in the light most favorable to the plaintiff and drawing all reasonable inferences therefrom in plaintiff's favor, the Court holds that plaintiff has failed to establish that an appreciable number of ordinarily prudent purchasers are likely to be misled or confused

### Relief

Defendant is entitled to summary judgment dismissing the Lanham Act claim on an independent basis. As noted, plaintiff conceded that it is entitled to no damages in view of its concession (Pl.Mem. 28) that IBM acted in good faith. *See Bambu Sales, Inc. v. Ozak Trading Inc.,* 58 F.3d 849, 854 (2d Cir.1995) (plaintiff must prove willful infringement to recover damages); *George Basch Co. v. Blue Coral, Inc.,* 968 F.2d 1532, 1540 (2d Cir.1992), *cert. denied,* 506 U.S. 991, 113 S.Ct. 510, 121 L.Ed.2d 445 (1992) (same). All that remains is prayer for an injunction, and the Court is satisfied that equitable considerations would warrant the denial of an injunction in any case. *See generally W.W.W. Pharmaceutical,* 984 F.2d at 576 (court should consider equitable factors); *Vitarroz Corp. v. Borden, Inc.,* 644 F.2d 960, 965–68 (2d Cir.1981) (same).

█ In determining whether to issue an injunction in trademark case, courts typically consider (1) the nature of the senior user's priority; (2) the senior user's delay in asserting its claim; and (3) the relative harm to the parties. *See Vitarroz,* 644 F.2d at 967.

█ These factors, along with defendant's good faith in adopting the mark, strongly favor granting defendant's motion for summary judgment. While Mejia is the prior user, its use was confined in geographic scope and, even within that area, quite limited. The duration of its prior use was short. When Mejia discussed the issue with IBM in 1993, it conceded that there was no actual confusion in the marketplace.[17] After discus-

---

16. Mr. Greenspan, a personal friend of Ms. Mejia, and the event coordinator of Tylin, were not even potential customers of plaintiff.

17. *See* note 2 *supra.* The full context of Mejia's letter stated in relevant part:

"After we spoke on the telephone last Monday, July 26, 1993, I felt that, in light of your valid observation that there is no actual confusion in the marketplace based on the differences between the indicated offerings of our respective

sion with IBM of the possibility of selling any rights Mejia held to the word "EduQuest," plaintiff remained silent for six months before sending IBM a cease and desist letter that initiated this litigation. Although in some cases it is only with the passage of time that harm becomes apparent, there was ample opportunity for this plaintiff to assess the risk earlier. Defendant relied on plaintiff's inactivity as assurance, which is an equitable factor militating against the award of injunction at this time, especially where plaintiff's claim, if not insufficient as a matter of law, is exceptionally weak on the merits.

Moreover, even viewing the evidence most favorably to the plaintiff, the Court is not persuaded that failure to enjoin the defendant from continued use of the mark "Edu-Quest" would cause undue harm. Rather, the harm and unfairness would seem greater if plaintiff were awarded "exclusive dominion over the use of the [disputed] word," thereby impairing defendant's and other parties' entrance into different areas of endeavor. An "injunction would greatly harm [IBM] without giving [Mejia] much benefit. In such cases, equitable relief is not warranted." *W.W.W. Pharmaceutical,* 984 F.2d at 575.

*State Claims*

IBM is entitled to summary judgment dismissing plaintiff's state law claims as well.[18]

■ The conceded absence of evidence of bad faith on the part of IBM alone mandates the dismissal of the state unfair competition claim. "[T]he essence of unfair competition under New York common law is the bad faith misappropriation of the labor and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods." *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.,* 58 F.3d 27, 34 (2d Cir. 1995) (internal quotations omitted). More-

over, the lack of an issue of fact material to determining the likelihood of confusion independently warrants dismissal of the unfair competition claim. *Id.* at 35; *W.W.W. Pharmaceutical,* 984 F.2d at 576.

■ Nor does the dilution claim withstand summary judgment. Trademarks protected by the New York anti-dilution statute, New York General Business Law § 368–d (McKinney 1984), must be of truly distinctive quality or have acquired secondary meaning in order to be protected against dilution. *Deere & Co. v. MTD Products, Inc.,* 41 F.3d 39, 42 (2d Cir.1994); *Sally Gee, Inc. v. Myra Hogan, Inc.,* 699 F.2d 621, 624 (2d Cir.1983). The term "secondary meaning" as used in New York's anti-dilution statute is not the same as defined under federal trademark law,[19] and many commentators and courts have required marks to be "extremely strong" to be eligible for protection. *See Sally Gee,* 699 F.2d at 625; *see also Allied Maintenance Corp. v. Allied Mechanical Trades, Inc,* 42 N.Y.2d 538, 545–46, 399 N.Y.S.2d 628, 369 N.E.2d 1162 (1977). Although plaintiff has provided sufficient evidence that its mark warrants protection under the Lanham Act, plaintiff has not shown that its mark is so strong as to warrant protection under the anti-dilution statute.

■ In any event, there is insufficient evidence of the other essential element of a dilution claim: tarnishment or blurring.[20] Plaintiff has not shown tarnishment from association with IBM's mark because there is no dispute that IBM's mark is used on high quality products. *See Deere & Company,* 41 F.3d at 43 (tarnishment generally arises when plaintiff's mark is linked to products of shoddy quality or unsavory nature); *cf. Sally Gee,* 699 F.2d at 625–26 (plaintiff had not and

companies, I would like to meet with you personally discuss your concern of possible future confusion." (Def.App.Ex. 2)

**18.** Despite the dismissal of the Lanham Act claim, the Court exercises supplemental jurisdiction to decide the motions for the related state claims pursuant to 28 U.S.C. § 1367(a).

**19.** Under federal trademark law, the term means that a mark has come to identify the source of goods in the minds of consumers. *Centaur Com-*

*munications, Ltd. v. A/S/M Communications, Inc.,* 830 F.2d 1217, 1221 (2d Cir.1987). Thus, secondary meaning reflects on the degree that a mark has acquired distinctiveness in the marketplace, which bears on the first *Polaroid* factor, the strength of the mark.

**20.** Competition between the products and confusion about the source of the products is not required under a dilution claim. *Sally Gee,* 699 F.2d at 624.

could not prove tarnishment of its products given defendant's higher quality products). Plaintiff has pointed to no specific evidence in the record of blurring. (Pl.Mem.33) Accordingly, defendant is entitled to dismissal of the dilution claim.[21]

*Conclusion*

For the foregoing reasons, defendant's motion for summary judgment dismissing the complaint is granted in its entirety.

SO ORDERED.

---

**21.** Although it is not clear that defendant's good faith independently warrants dismissal of the dilution claim, it at least supports that result strongly. *See Deere & Co.,* 41 F.3d at 42, 46; *accord, Sally Gee,* 699 F.2d at 626.